432 S.E.2d 39

**STATE of West Virginia, Plaintiff Below, Appellee,**

**v.**

**Ronald Dean RUMMER, Defendant Below, Appellant.**

**No. 21095.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 26, 1993.

Decided May 25, 1993.

Concurring Opinion of Justice Workman May 28, 1993.

Dissenting Opinion of Justice Neely May 28, 1993.

MILLER, Justice:

This is an appeal from the final order of the Circuit Court of Wood County, entered September 13, 1991, sentencing the defendant, Ronald Dean Rummer, to two concurrent terms of imprisonment upon his conviction by a jury of two counts of sexual abuse in the first degree. The defendant contends that both sentences arose from the same transaction and that they therefore constitute unconstitutional double jeopardy. He also cites as error the trial court's admission at trial of his out-of-court statements to police and the admission of the prosecuting witness's out-of-court identification of the defendant. Because we find no error below, the judgment of the trial court is affirmed.

The charges against the defendant arose from an incident that occurred in the early morning hours of June 21, 1991. C.D.,[1] a twenty-one-year-old woman, had spent the earlier part of the evening riding around Parkersburg with friends in a friend's car. At approximately 1:00 a.m., as C.D. and her friends neared C.D.'s home, C.D. informed her friends that she wanted to go home. This led to a minor argument with her friends because they desired to continue driving. Therefore, C.D. was let out of the car approximately eight blocks from her home.

After taking leave of her friends, C.D. began to walk home. As she was walking, she became aware of a vehicle following her at a very slow rate of speed. C.D. noticed that the driver of the vehicle was hunched over as he drove and appeared to be balding. Gradually, the vehicle passed C.D. and turned the corner. Shortly thereafter, C.D. became aware of a man following her on foot. She became concerned and increased her pace, but the man followed even faster. As C.D. turned towards the man again, he caught her and roughly grabbed her. C.D. yelled and told him to leave her alone. He put one hand between her legs and began rubbing roughly. He attempted to put his other hand up

Darrell V. McGraw, Jr., Atty. Gen., Barry Koerber, Asst. Atty. Gen., Charleston, for appellee.

William L. Jacobs, Parkersburg, for appellant.

1. As this case involves a sensitive matter, we shall follow our traditional practice and refer to the victim by initials. *See State v. Peyatt,* 173 W.Va. 317 n. 4, 315 S.E.2d 574 n. 4 (1983).

C.D.'s shirt, and then grabbed her breasts through her shirt. C.D. tried to escape, but fell to the ground. The man fell on top of her and again roughly fondled her breasts through her shirt with both hands. She finally pushed him off of her and got up and ran to a nearby pay phone.

Upon reaching the pay phone, C.D. first dialed 9–1–1 and informed the police of the attack and her location, and a policeman was immediately dispatched to take her statement. She then phoned her mother, who lived nearby, and her mother drove to meet her.

C.D.'s mother arrived within minutes, and, as C.D. and her mother waited for the police to arrive, C.D. noticed the vehicle that had earlier followed her pass by. Shortly thereafter, a policeman, Officer Parsons, arrived. Officer Parsons asked C.D. if she wanted to file a complaint, and she agreed to do so. He asked C.D. to sit in his police cruiser and give a statement. She did so, and began telling the officer the details of the assault. She told him that the man who assaulted her was wearing white pants and a white shirt with red or pink stripes.

While she was sitting in the police car giving her statement to Officer Parsons, C.D. noticed the car that had earlier followed her again pass by. When she told this to Officer Parsons, he gave chase to the car. After pursuing it for several blocks, he was able to stop the car. He then asked C.D. to advise him if the driver, the lone occupant of the car, was the man who attacked her. After approaching the car, C.D. identified the man as her attacker.

After the defendant was identified by C.D., Officer Parsons obtained his name and address and allowed him to leave the scene. The following day, a Detective Kenneth Miller telephoned the defendant and asked him to come by the police station and make a statement. Prior to the defendant's arrival, Detective Miller obtained a warrant for the defendant's arrest. Upon his arrival at the police station, the defendant was read his *Miranda* rights,[2] and he waived them. He then gave a tape recorded statement during which he denied any knowledge of the incident. He also denied knowing C.D. in any way. Thereafter, the defendant was arrested by Detective Miller, and was presented to a magistrate. The record does not reveal how much time elapsed between the defendant's arrival at the police station and his presentment before the magistrate.

At trial, the defendant testified that he had, in fact, followed C.D. in his car and later approached her on foot and asked her to go out with him. Although he admitted putting his arm around her waist, the defendant denied touching her breasts or sex organ. He asserted that he left her upon her request that he do so. He contended that he was familiar with C.D., whom he suggested was a prostitute. He also asserted that he had "picked up" C.D. several weeks before the incident, and that they had had sexual intercourse at that time.

C.D. testified in rebuttal that she did not know the defendant and had never seen the defendant socially. She testified that the only time she may have seen the defendant was several years before the incident when she worked in a drive-through store. The State also called Detective Miller to testify regarding the defendant's statement given at the police station in which he denied knowing C.D. The defendant's earlier objection to the use of this statement was heard at an *in camera* hearing, and the objection was denied.

At the conclusion of the trial, the defendant was found guilty by the jury of two counts of sexual abuse in the first degree. By order entered September 13, 1991, the trial court sentenced the defendant to two concurrent sentences of not less than one year nor more than five years imprisonment in the penitentiary.

## I.

### Double Jeopardy

With regard to the defendant's double jeopardy claim, he contends that his two

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

convictions for first degree sexual abuse were improper because only one offense was committed. This conclusion is based upon the premise that the touching of the victim's breasts and her sex organ occurred within a brief period of time and should be considered one act. The defendant asserts that, under these circumstances, he is receiving multiple punishments for the same offense, a situation prohibited under the Double Jeopardy Clause of both our State and the federal constitutions.

■ Our double jeopardy principles have been patterned after the United States Supreme Court's interpretation of the Double Jeopardy Clause found in the Fifth Amendment to the United States Constitution.[3] Our general pronouncement of the scope of our Double Jeopardy Clause, contained in Section 5 of Article III of the West Virginia Constitution,[4] is set out in Syllabus Point 1 of *Conner v. Griffith*, 160 W.Va. 680, 238 S.E.2d 529 (1977):

> "The Double Jeopardy Clause in Article III, Section 5 of the *West Virginia Constitution*, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense."

The foregoing Syllabus Point is derived from *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).[5]

■ In *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983), we discussed in detail those cases decided by the United States Supreme Court which dealt with criminal statutes that were claimed to vio-

late double jeopardy principles through the imposition of multiple punishments for the same offense. We pointed out in *Zaccagnini* that the beginning point for such an analysis is the test set out in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We summarized the *Blockburger* test in Syllabus Point 8 of *Zaccagnini:*

> "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."

We further recognized in *Zaccagnini* that the *Blockburger* test was not only a rule of statutory construction, but was also recognized by the United States Supreme Court to be a means of identifying legislative intent where such intent is unclear. We cited the following statement from *Albernaz v. United States*, 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275, 282 (1981), in *Zaccagnini:*

> " 'The *Blockburger* test is a "rule of statutory construction," and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent.' " 172 W.Va. at 502, 308 S.E.2d at 142. (Citation omitted).

The Supreme Court in *Albernaz* elaborated on the *Blockburger* test's role in determining legislative intent in a double jeopardy analysis when it quoted this language from note 17 of *Iannelli v. United States*, 420 U.S. 770, 785, 95 S.Ct. 1284, 1293–94, 43 L.Ed.2d 616, 627 (1975):

---

**3.** The applicable provision of the Fifth Amendment states: "Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

**4.** Section 5 of Article III of the West Virginia Constitution contains this double jeopardy language: "Nor shall any person, in any criminal case, ... be twice put in jeopardy of life or liberty for the same offence."

**5.** In *Conner v. Griffith, supra,* we quoted the following language from *North Carolina v. Pearce*, 395 U.S. at 717, 89 S.Ct. at 2076, 23 L.Ed.2d at 664–65: " '[The Double Jeopardy Clause] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' " 160 W.Va. at 682, 238 S.E.2d at 530.

" 'The test articulated in *Blockburger v. United States*, 284 U.S. 299, [52 S.Ct. 180, 76 L.Ed. 306] (1932), serves a generally similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. In determining whether separate punishment might be imposed, *Blockburger* requires that courts examine the offenses to ascertain "whether each provision requires proof of a fact which the other does not." *Id.*, at 304, [52 S.Ct. 180, 76 L.Ed. 306]. As *Blockburger* and other decisions applying its principle reveal ... the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.' " 450 U.S. at 337–38, 101 S.Ct. at 1141–42, 67 L.Ed.2d at 281.

In *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court considered the aspect of double jeopardy relating to multiple punishments for the same offense in regard to two Missouri statutes. One statute related to the felony of robbery with the use of a deadly weapon. The other statute provided that any person who committed any felony with the use of a deadly weapon was guilty of armed criminal action. The latter crime provided for a penalty of not less than three years, in addition to any punishment provided by law for the underlying felony committed by the use of a deadly weapon.

The Missouri Court of Appeals[6] concluded that, under these statutes, the imposition of two sentences upon a defendant who had committed the crime of armed robbery violated the double jeopardy prohibition against multiple sentences for the same offense.[7] After granting certiorari, the United States Supreme Court established that the Missouri Court of Appeal's legal interpretation of the Double Jeopardy Clause was not binding upon it and concluded:

"[S]imply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* [*v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)] is not a constitutional rule requiring courts to negate clearly expressed legislative intent." 459 U.S. at 368, 103 S.Ct. at 679, 74 L.Ed.2d at 543–44.

We have recently discussed and applied these double jeopardy principles in *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992), where we upheld separate convictions under both our sexual offense statute and W.Va.Code, 61–8D–5(a) (1991), where the same conduct formed the basis for both convictions. In *Gill*, the child's custodian had committed several sex acts on her in violation of W.Va.Code, 61–8B–3(a)(2) (1984), our first degree sexual assault statute. The State also charged and convicted the defendant under W.Va.Code, 61–8D–5(a), which relates to sexual offenses committed by a parent, guardian, or custodian of a child. The defendant claimed that he was being punished twice for the same act.

In *Gill*, we recognized the Supreme Court's acknowledgment that the legislature has the power to define crimes and determine their punishment. We quoted this language from *Ohio v. Johnson*, 467 U.S. 493, 499, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425, 433 (1984): " 'Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, ... the question under the Double Jeopardy Clause whether punishments are "multiple" is essentially one of legislative intent[.]' (Citations omitted)." 187 W.Va. at 141, 416 S.E.2d at 258. (Footnote omitted).

In *Gill*, we also discussed *Missouri v. Hunter*, *supra*, and the later case of *Gar-*

---

6. The Missouri Supreme Court did not issue an opinion in *Hunter* because it denied review.

7. *State v. Hunter*, 622 S.W.2d 374 (Mo.App. 1981).

*rett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). In those cases, the Supreme Court expressly recognized that where the legislature intended to make the same conduct the subject of two criminal acts and, therefore, separately punishable, this could be done even though under the *Blockburger* test, the crimes would constitute the same offense:

" 'Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature—in this case Congress—intended that each violation be a separate offense....

\*     \*     \*     \*     \*     \*

" '... We have recently indicated that the *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history.' (Citations omitted)." 187 W.Va. at 142, 416 S.E.2d at 259.

After discussing the foregoing United States Supreme Court cases, we summarized their principles in Syllabus Points 7 and 8 of *Gill, supra:*

"7. A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment.

"8. In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in *Block-*

*burger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses."

Thus, the cited Syllabi from *Gill* begin with an analysis of the relevant criminal provisions to determine if a legislative intent to require separate punishments can be discerned. If there is no clear legislative intent, then an analysis under the *Blockburger–Zaccagnini* test concerning the elements of proof should be made.

Our conclusion in *Gill* was that the language in W.Va.Code, 61–8D–5(a), stating that "[i]n addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection," was sufficiently explicit to demonstrate that the legislature intended to create a separate parent-custodial sexual misconduct offense in addition to our general sexual offense statutes.[8] Thus, two separate punishments were permissible under double jeopardy principles even though they arose from the same act.[9]

We have also discussed double jeopardy considerations in relation to sexual offenses in several other cases. In *State v. Carter,* 168 W.Va. 90, 282 S.E.2d 277 (1981), the defendant had been convicted of two counts of first degree sexual assault. The first count related to oral intercourse and the second to anal intercourse. We reviewed the definition of "sexual intercourse" contained in W.Va.Code, 61–8B–1(7) (1986), which provided, in relevant part,

---

8. In Syllabus Point 9 of *State v. Gill, supra,* we said:

"W.Va.Code, 61–8D–5(a) (1988), states, in part: 'In addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection[.]' Thus, the legislature has clearly and unequivocally declared its intention that sexual abuse involving parents, custodians, or guardians, W.Va.Code, 61–8D–5, is a separate and distinct crime from general sexual offenses, W.Va.Code, 61–8B–1, *et seq.,* for purposes of punishment."

9. *State v. Gill* obviously modifies Syllabus Point 4 of *State v. Reed,* 166 W.Va. 558, 276 S.E.2d 313 (1981): "Double jeopardy prohibits multiple punishment for the same offense, therefore under our criminal sexual conduct statute, *W.Va. Code,* 61–8B–1 *et seq.* [1976], a single sexual act cannot result in multiple criminal convictions." The issue in *Reed* centered on whether double jeopardy "bars the conviction for a lesser offense when the accused has been convicted of the greater offense." 166 W.Va. at 565–66, 276 S.E.2d at 319.

"penetration, however slight, of the female sex organ by the male sex organ, or involving contact between the sex organs of one person and the mouth or anus of another person," and came to this conclusion:

> "The use of the word 'or,' which is a conjunction, expresses the legislative intent that sexual intercourse can be committed in each of the various alternative ways, with each type of prohibited contact constituting a separate offense. From this, it is apparent that the Legislature chose to broadly define the term 'sexual intercourse' so that it would cover a variety of sexual encounters." 168 W.Va. at 92, 282 S.E.2d at 279–80. (Footnote omitted).[10]

In *Carter*, although we did not utilize the *Blockburger–Zaccagnini* test, the same result would have been reached under it as interpreted by the United States Supreme Court and accepted by us in *Gill.* Under the *Blockburger–Zaccagnini* test, we would have analyzed legislative intent by determining if there was any clear expression of such intent. In the absence of any clear expression of such intent, we would have applied the *Blockburger–Zaccagnini* test to the elements of the crimes. It is clear that the offense of first degree sexual assault as set out in W.Va.Code, 61–8B–3(a) (1991),[11] does not, on its face, contain any clear statement of legislative intent

with regard to separate punishments, as was the case in *Gill.* However, applying a *Blockburger–Zaccagnini* analysis to W.Va. Code, 61–8B–3(a), we note that among the components of first degree sexual assault is the term "sexual intercourse." "Sexual intercourse" is defined in W.Va.Code, 61–8B–1(7), and consists of three alternative acts: (1) "penetration, however slight, of the female sex organ by the male sex organ," or (2) "contact between the sex organs of one person and the mouth ... of another person," or (3) contact between the sex organs of one person and ... the anus of another person."

Clearly, by statutory definition, the elements of the crime of first degree sexual assault through sexual intercourse can be committed by three distinct acts or methods.[12] Under the *Blockburger–Zaccagnini* test, each of the crimes "requires proof of an additional fact which the other does not." Syllabus Point 8, in part, *State v. Zaccagnini, supra.* In the context of "sexual intercourse," the female sex organs, the mouth, and the anus are each distinct and separate matters of proof, any one of which is sufficient to prove the crime. If a defendant commits both unlawful oral and anal intercourse, as occurred in *Carter*, the defendant has committed two separate offenses.[13]

---

**10.** In *State v. Carter*, 168 W.Va. at 93, 282 S.E.2d at 280, we made this comment:

> "Most courts which have had occasion to construe similar sexual offense statutes [to our own] have reached the same conclusion. *Hamill v. Wyoming*, 602 P.2d 1212 (Wyo.1979); *Padilla v. State*, 601 P.2d 189 (Wyo.1979); cf. *State v. Hill*, 104 Ariz. 238, 450 P.2d 696 [ (1969) ]; *State v. Ware*, 53 Ohio App.2d 210, 372 N.E.2d 1367 (1977), aff'd, 63 Ohio St.2d 84, 406 N.E.2d 1112 (1980); *Commonwealth v. Romanoff*, 258 Pa.Super. 452, 392 A.2d 881 (1978)."

**11.** W.Va.Code, 61–8B–3(a), provides:

> "A person is guilty of sexual assault in the first degree when:
> "(1) Such person engages in sexual intercourse or sexual intrusion with another person and, in so doing:
> "(i) Inflicts serious bodily injury upon anyone; or
> "(ii) Employs a deadly weapon in the commission of the act; or

> "(2) Such person, being fourteen years old or more, engages in sexual intercourse or sexual intrusion with another person who is eleven years old or less."

**12.** The Supreme Court of California reached the same result in *People v. Perez*, 23 Cal.3d 545, 553, 153 Cal.Rptr. 40, 44, 591 P.2d 63, 68 (1979), where it concluded: "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act."

**13.** The same analysis would apply to the term "sexual intrusion," which is also used in W.Va. Code, 61–8B–3, our first degree sexual assault statute. *See* note 11, *supra.* "Sexual intrusion" is defined in W.Va.Code, 61–8B–1(8), as "any act between persons not married to each other involving penetration, however slight, of the female sex organ or of the anus of any person by an object for the purpose of degrading or humiliating the person so penetrated or for gratifying the sexual desire of either party."

In both *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983), and *State v. Trail*, 174 W.Va. 656, 328 S.E.2d 671 (1985), we applied the *Blockburger–Zaccagnini* analysis and found no double jeopardy violations. In *Peyatt*, we affirmed a sexual assault conviction and an incest conviction arising from the same act. In *Trail*, we affirmed convictions for abduction with intent to defile and first degree sexual assault arising out of the same incident. In neither case did we elaborate on the *Blockburger–Zaccagnini* test as a means of identifying legislative intent to create separate offenses. Had we done so, the end result would have been the same.

■ In the instant case, we deal with two convictions of first degree sexual abuse. First degree sexual abuse is defined in W.Va.Code, 61–8B–7(a) (1984),[14] and utilizes the term "sexual contact." This term, like the term "sexual intercourse," is defined in W.Va.Code, 61–8B–1, which states, in pertinent part:

" 'Sexual contact' means any intentional touching, either directly or through clothing, of the anus or any part of the sex organs of another person, or the breasts of a female or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party."

Again, we note the legislative use of the word "or" throughout this definition, which, under our rules of statutory construction, is clearly designed to separate the various acts that may constitute "sexual contact." As we stated in *State v. Taylor*, 176 W.Va. 671, 346 S.E.2d 822 (1986) (a case involving our stolen property statute, W.Va.Code, 61–3–18 [1923]):

"Each of the forbidden acts set forth in the statute is separated by the disjunc-tive 'or,' i.e., 'buy or receive' or 'aid in concealing' or 'transfer.' We have customarily stated 'that where the disjunctive "or" is used, it ordinarily connotes an alternative between the two clauses it connects.' *Albrecht v. State*, 173 W.Va. 268, 271, 314 S.E.2d 859, 862 (1984), *citing State v. Elder*, 152 W.Va. 571, 577, 165 S.E.2d 108, 112 (1968)." 176 W.Va. at 675, 346 S.E.2d at 825–26.

■ Although this is the first occasion we have had to discuss the double jeopardy aspect of "sexual contact," we find that its statutory pattern is substantially similar to that of "sexual intercourse," which we discussed in regard to double jeopardy principles in *State v. Carter, supra*. Applying the *Blockburger–Zaccagnini* test to the instant case, we find that the principal element of W.Va.Code, 61–8B–7, which defines sexual abuse in the first degree, involves "sexual contact" with another person. The term "sexual contact" is defined in W.Va.Code, 61–8B–1(6), and identifies several different acts which constitute sexual contact. Each act requires proof of a fact which the other does not. Consequently, a defendant who commits two or more of the separate acts of sexual contact on a victim may be convicted of each separate act without violation of double jeopardy principles.

When we look to other jurisdictions that have dealt with double jeopardy challenges to their sexual contact statute, we find that they have reached a result similar to the one we reach today. The Court of Appeals of New Mexico addressed facts almost identical to those presented here in *State v. Williams*, 105 N.M. 214, 730 P.2d 1196 (1986). In that case, the defendant was convicted of two counts of criminal sexual contact. The convictions resulted from unlawfully touching his victim's breasts and genital area during a time span of less than

---

**14.** W.Va.Code, 61–8B–7(a), states, in pertinent part:

"(a) A person is guilty of sexual abuse in the first degree when:

"(1) Such person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion; or

"(2) Such person subjects another person to sexual contact who is physically helpless; or

"(3) Such person, being fourteen years old or more, subjects another person to sexual contact who is eleven years old or less."

five minutes. The relevant statute stated that "[c]riminal sexual contact is intentionally touching or applying force without consent to the unclothed intimate parts of another who has reached his eighteenth birthday* * * * For purposes of this section 'intimate parts' means the primary genital area, groin, buttocks, anus or breast." 105 N.M. at 216, 730 P.2d at 1198, *citing* N.M.Stat.Ann. § 30–9–12 (1984). The Court of Appeals held that the intent of the New Mexico legislature was to protect the victim from intrusions to each enumerated part, and, therefore, that "[s]eparate punishments are sustainable where evidence shows distinctly separate touchings to the different parts." 105 N.M. at 217, 730 P.2d at 1199.

Although *State v. Williams, supra,* did not involve any lengthy analysis of United States Supreme Court double jeopardy decisions, such an analysis was recently undertaken by the New Mexico Supreme Court in *Swafford v. State,* 112 N.M. 3, 810 P.2d 1223 (1991). In *Swafford,* the New Mexico court recognized some confusion in its double jeopardy decisions, reviewed recent United States Supreme Court cases that had construed *Blockburger,* and came to this conclusion:

> "Taking as our cue the repeated admonitions of the Supreme Court that the sole limitation on multiple punishments is legislative intent, *Grady v. Corbin,* [495 U.S. 508, 517, 110 S.Ct. 2084, 2091, 109 L.Ed.2d 548, 561 (1990)]; *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 [542] (1983), we adopt today a two-part test for determining legislative intent to punish. The first part of our inquiry asks the question that Supreme Court precedents assume to be true: whether the conduct underlying the offenses is unitary, *i.e.,* whether the same conduct violates both statutes. The second part focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses. Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." 112 N.M. at 13, 810 P.2d at 1233.

This approach is entirely consistent with that which we have evoked and discussed in our double jeopardy analysis herein.

The Court of Appeals of Utah in *State v. Suarez,* 736 P.2d 1040 (Utah App.1987), was also faced with a situation like the one in this case. There, the defendant was charged with two counts of forcible sexual abuse in violation of Utah Code Ann. § 76–5–404 (1982). The defendant had placed his mouth on the victim's breasts and touched her genitals in the same transaction. The applicable statute, Utah Code Ann. § 76–5–404(1) stated:

> " '(1) A person commits forcible sexual abuse if, under circumstances not amounting to rape or sodomy, or attempted rape or sodomy, the actor touches the anus or any part of the genitals of another, *or otherwise* takes indecent liberties with another, or causes another to take indecent liberties with the actor or another, with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person, without the consent of the other, regardless of the sex of any participant.' (Emphasis added)." 736 P.2d at 1042.

Although both charges were defined in the same section, the Court of Appeals emphasized that the charges were separated by the conjunctive "or," just as they are in the instant case. Therefore, the Utah court found that the "[d]efendant's argument is flawed in that he first placed his mouth on the victim's breasts, the taking of indecent liberties, and then placed his hand on her vagina. These are separate acts requiring proof of different elements and constitute separate offenses." 736 P.2d at 1042.

The Court of Appeals of Maryland in *State v. Boozer,* 304 Md. 98, 497 A.2d 1129 (1985), was confronted with an appeal by the State from a trial court's dismissal of a fourth degree sexual assault charge against a defendant. The State had previously charged the defendant with unlawfully engaging in a sexual act with a person age fourteen and four or more years youn-

ger than he. The State subsequently entered a *nolle prosequi* to that charge and issued a new statement of charges alleging that the defendant had unlawfully attempted to have vaginal intercourse with the fourteen-year-old victim. Both charges were based upon the same incident, and both charges were based upon the same statute describing fourth degree sexual assaults. Md.Ann.Code art. 27, § 464C. However, a separate article of the Maryland Code provided definitions for "sexual act" and "vaginal intercourse," and the Court of Appeals held that, because the two were separately defined, they constituted separate crimes and were not the same for double jeopardy purposes.[15]

The Supreme Court of Kentucky in *Hampton v. Commonwealth,* 666 S.W.2d 737 (Ky.1984), dealt with a situation where a defendant was charged with first degree sodomy and first degree sexual abuse. The charges arose from an incident where the defendant performed fellatio on the victim and caused the victim to perform the same act on him either simultaneously or continuously. The Supreme Court of Kentucky held that "the separate charge of sexual abuse is based not on incidental contact, but on a separate act of sexual gratification. The fact that the two sexual acts occurred either simultaneously or nearly so is irrelevant." 666 S.W.2d at 739. Therefore, both charges stemming from the same transaction did not violate double jeopardy principles.

Other courts have held that charges of sexual assault in the first degree and sexual assault in the third degree may be brought for conduct occurring in the same transaction because they require proof of facts independent of each other. *State v. Mezrioui,* 26 Conn.App. 395, 602 A.2d 29 (1992). It has also been held that a dentist who subjects a female patient to four inci-

dents of unlawful sexual contact while she was under the effects of nitrous oxide during the course of a root canal procedure could be convicted of four counts of sexual abuse in the first degree. *People v. Yankowitz,* 169 A.D.2d 748, 564 N.Y.S.2d 488 (1991). *See also Perez, supra; State v. Smith,* 276 S.C. 484, 280 S.E.2d 56 (1981); *State v. Eisch,* 96 Wis.2d 25, 291 N.W.2d 800 (1980). *Cf. United States v. DeCorte,* 851 F.2d 948 (7th Cir.1988); *Robinson v. Lockhart,* 823 F.2d 210 (8th Cir.1987); *United States v. Solomon,* 753 F.2d 1522 (9th Cir.1985); *United States v. Anderson,* 851 F.2d 384 (D.C.Cir.1988), *cert. denied,* 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989). *See generally* Project, *Twenty–First Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal,* 80 Georgetown L.J. 1308 (1992).

Finally, we find unpersuasive the argument that first degree sexual abuse under W.Va.Code, 61–8B–7(a), should be considered like a battery since it involves an unlawful touching of various parts of the body. Our battery statute, W.Va.Code, 61–2–9(c) (1978), makes no attempt to delineate the crime either by the portions of the body touched, as does our sexual abuse statute, or by the number of blows struck. Consequently, the traditional double jeopardy analysis of a battery through legislative intent would fail to reveal any intention to create a separate crime based upon separate blows.[16] As we have pointed out, our sexual abuse statute, through its specific enumeration of the different ways in which sexual abuse can be accomplished, shows a legislative intent to separately punish sexual abuse to different parts of the body.

Courts that have discussed the battery question have not attempted a double jeopardy analysis based upon legislative intent.

---

**15.** The *Boozer* court further stated:

"The courts of this country have had little difficulty in concluding that separate acts resulting in separate insults to the person of the victim may be separately charged and punished even though they occur in very close proximity to each other and even though they are part of a single criminal episode or transaction." 304 Md. at 105, 497 A.2d at 1132.

**16.** This type of analysis might well be used in a sexual abuse case where the defendant touched both of the victim's breasts at the same time. The term "sexual contact" in W.Va.Code, 61–8B–1(6), uses the phrase "or the breasts of a female."

Instead, they conclude without any detailed analysis that multiple blows struck during the same battery are not separate crimes. *See, e.g., Weatherly v. State,* 733 P.2d 1331 (Okla.Cr.App.1987). *Cf. People v. Berner,* 42 Colo.App. 520, 600 P.2d 112 (1979) (where the batteries are separated in time, two crimes are deemed to have occurred).

It is clear from the foregoing cases that most jurisdictions that have addressed whether a legislature intended to distinguish separate sexual crimes by listing different methods of sexual assault or abuse have found that the legislature did intend to so distinguish. We also conclude that the West Virginia legislature, in establishing the crime of sexual abuse in the first degree under W.Va.Code, 61–8B–7(a), intended to make separate offenses of each of the various methods to commit the crime outlined in W.Va.Code, 61–8B–1(b). Therefore, the defendant was not subjected to unconstitutional double jeopardy when he was convicted of two counts of sexual abuse in the first degree for separately and unlawfully touching his victim's breasts and sex organ in a single criminal episode.

## II.

### *PROMPT PRESENTMENT*

■ The defendant further asserts that the trial court erred in allowing the use of the defendant's statement to Detective Miller to impeach his testimony. We note that the defendant voluntarily agreed to appear at the police station and answer questions upon Detective Miller's request. Detective Miller had obtained a warrant for the defendant's arrest prior to the defendant's arrival at the police station. The defendant freely waived his *Miranda* rights and was not coerced in any way into making his statements. Furthermore, the defendant did not confess to the crime.

At trial, however, the defendant attempted to persuade the jury that C.D. was a prostitute with whom he had recently had sexual intercourse. While the defendant admitted to following C.D. both by car and by foot on the night of the incident, in his statement to Detective Miller, the defendant denied knowing C.D. When the State attempted to impeach his testimony through the use of the statement given to Detective Miller, the defendant objected and an *in camera* hearing was conducted. At the conclusion of the hearing, the defendant again objected to the use of his statement, alleging that such use violated our "prompt presentment" rule.

Our prompt presentment rule is stated in W.Va.Code, 62–1–5:

"An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a justice [magistrate] of the county in which the arrest is made. When a person arrested without a warrant is brought before a justice [magistrate], a complaint shall be filed and a warrant issued forthwith. The officer executing the warrant shall make return thereof to the justice [magistrate] before whom the defendant is brought." [17]

We interpreted the prompt presentment rule in Syllabus Point 2 of *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986):

"Our prompt presentment rule contained in *W.Va.Code* 62–1–5 [1965], and Rule 5(a) of the *West Virginia Rules of Criminal Procedure,* is triggered when an accused is placed under arrest. Furthermore, once a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is also triggered."

Applying *Humphrey* to the instant case, it seems clear that the prompt presentment rule was "triggered" upon the defendant's arrival at the police station because the police had sufficient probable cause for his arrest. In fact, they had already obtained an arrest warrant. Nonetheless, there is

---

**17.** Rule 5(a) of the West Virginia Rules of Criminal Procedure contains parallel language to

W.Va.Code, 62–1–5.

no evidence in the record detailing the length of time that Detective Miller questioned the defendant. Nor is there any testimony concerning the length of time that elapsed between the defendant's arrival at the police station and his presentment before a magistrate. Assuming, however, that the delay in presentment was unreasonable, we note that the defendant's statement was unquestionably voluntary. No allegation of coercion is alleged. The defendant drove to the police station on his own at Detective Miller's request and waived his *Miranda* rights prior to answering the detective's questions.

Under these facts, we find that even if the defendant was subjected to an unnecessary delay prior to his presentment to a magistrate, the State could properly use his statement to impeach his testimony at trial. This is because a *voluntary* statement made by a defendant that is inadmissible in the State's case-in-chief due to violations of the prompt presentment rule is nevertheless admissible solely for impeachment purposes. As we stated in Syllabus Point 3 of *State v. Knotts*, 187 W.Va. 795, 421 S.E.2d 917 (1992):

> "Where a person accused of committing a crime makes a voluntary statement which is declared inadmissible in the State's case-in-chief due to a violation of the accused's prompt presentment rights pursuant to West Virginia Code § 62–1–5 [(1965)] and West Virginia Rule of Criminal Procedure 5(a), the statement may be admissible solely for impeachment purposes if the accused takes the stand at his trial and offers testimony inconsistent with the prior voluntary statement."

*See also* Syllabus Point 4, *State v. Goodmon*, 170 W.Va. 123, 290 S.E.2d 260 (1981); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

In this case, because the statement made by the defendant was voluntary, and was used only to impeach his testimony at trial, the lower court committed no error on this point.

## III.

### *SUGGESTIVE IDENTIFICATION*

■ The defendant also asserts that the trial court erred in denying his motion to suppress evidence of C.D.'s out-of-court identification of him on the night of the incident. The defendant claims that the prior identification of him by C.D. was so suggestive by Officer Parsons that it tainted C.D.'s identification of him at trial.

It has been said that almost any time a one-on-one confrontation between a crime victim and a crime suspect is arranged by the police, such a procedure inherently suggests to the victim that the suspect is the perpetrator of the crime. The Seventh Circuit Court of Appeals stated in *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 403 (7th Cir.), *cert. denied*, 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975):

> "Without question, almost any one-on-one confrontation between a victim of a crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty. The psychological factors [present] create a real risk of misidentification in such circumstances.... [One must] start then from the premise that significant suggestion is inherent in the use of any showup[.]" (Citations omitted).

*See also Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Palmer v. Peyton*, 359 F.2d 199 (4th Cir.1966). Thus, in this case, we conclude that the identification of the defendant in his vehicle by the victim at the request of the police was unduly suggestive.

Upon finding the police confrontation procedure used in the defendant's identification to be suggestive, we have followed the rationale of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See also Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). These cases hold that even though the initial identification of the defendant was

found to be unduly suggestive, it may still be admitted under the totality of the circumstances. By that it was meant that circumstances surrounding the witness's contact with the defendant at the time of the crime were such that the witness was able to form a sufficiently reliable independent basis for the identification other than the suggestive identification.

■ We summarized the test to be utilized in determining the totality of the circumstances in Syllabus Point 3 of *State v. Spence,* 182 W.Va. 472, 388 S.E.2d 498 (1989):

> " 'In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification [or testimony as to the out-of-court identification itself] a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' Syllabus Point 3, as amended, *State v. Casdorph,* 159 W.Va. 909, 230 S.E.2d 476 (1976)." [18]

Here, the trial court held an *in camera* proceeding prior to trial and evaluated the *Biggers* factors and found the victim's identification of the defendant to be reliable based upon the totality of the circumstances, particularly the witness's view of the defendant during the crime.[19] The evidence at the *in camera* hearing disclosed that the victim observed a car driving at a slow rate of speed as she was walking on the sidewalk adjacent to a public street in Parkersburg. The area was well lighted not only with street lights, but from lights from a car lot. She observed that the driver of the car was hunched over the steering wheel and was bald. Subsequently, she became aware of footsteps behind her and turned and observed the defendant. She increased her pace and turned again to observe that the defendant was closer and he grabbed her. She struggled with him and fell to the ground landing on her back with the defendant on top of her. She had sufficient opportunity to observe the defendant under adequate lighting.

Another factor to be considered is that the victim's attention was directed only to the defendant as he approached her and in the ensuing struggle. It is clear that she gave her undivided attention to the defendant. This is borne out by her accurate description of the defendant and his clothing that she gave to the police when they arrived within one-half hour of the event. Finally, on confronting the defendant in his car, which the police had stopped a short distance from the scene of the crime, the victim had no difficulty identifying the defendant. Therefore, we agree with the trial court's determination that there was a reliable independent basis for the victim's identification of the defendant other than the suggestive one-on-one identification in his car, and we find no reversible error on this ground.

## IV.

### CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Wood County is affirmed.

Affirmed.

---

18. We explained in *State v. Spence, supra,* that the bracketed portion of the Syllabus was designed to cover the point made in *Manson v. Braithwaite, supra,* which was " 'that the same criteria should also apply in determining whether the out-of-court identification itself should be suppressed.' " 182 W.Va. at 477, 388 S.E.2d at 503, *quoting State v. Boyd,* 167 W.Va. 385, 395, 280 S.E.2d 669, 678 (1981).

19. In *State v. Watson,* 164 W.Va. 642, 264 S.E.2d 628 (1980), we stated in Syllabus Point 1: " 'A defendant must be allowed an *in camera* hearing on the admissibility of a pending in-court identification when he challenges it because the witness was a party to pre-trial identification procedures that were allegedly constitutionally infirm.' Syllabus Point 6, *State v. Pratt,* 161 W.Va. 530, 244 S.E.2d 227 (1978)."

WORKMAN, Chief Justice, concurring:

I concur with the majority opinion because it is totally consistent with the law enunciated in many other cases by this Court as well as by the United States Supreme Court.

Because only about one-third of the dissenter's fifty-page diatribe actually relates to the majority opinion (the other two-thirds of which touches upon everything but the kitchen sink, is full of incredible stereotypes,[1] and which of course attributes almost all of society's ills to working women), I address only part II.

` The dissent fails to recognize, much less discuss, the recent United States Supreme Court cases that have fashioned the Double Jeopardy Clause relating to multiple punishments for the same criminal act as an inquiry into legislative intent. The majority traces this constitutional rule beginning with *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) through *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), and culminating with *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

Moreover, the majority traces this same development in our double jeopardy law most recently articulated in *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992), and extending back through *State v. Trail*, 174 W.Va. 656, 328 S.E.2d 671 (1985); *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983), and *State v. Carter*, 168 W.Va. 90, 282 S.E.2d 277 (1981). Furthermore, as the majority demonstrates, other jurisdictions have accepted those same double jeopardy principles in other similar sexual offense cases.

The most astounding thing about the dissent is the gross inconsistency of the dissenter's position on the double jeopardy issue in this sexual abuse case with his position on the same issue in numerous other contexts. In all of the cases cited from this Court, the dissenter joined the majority without comment. Why is the dissenter such a blazing civil libertarian *only* in the context of a sexual offense? (Generally, he is ready to uphold the maximum sentence for the pettiest of petit larcenists.)

Reading his dissent against the backdrop of his position in other criminal cases, one reaches the inescapable conclusion that he believes different principles should apply to sexual offenses than to other criminal offenses.

For example, in *State v. Johnson*, 179 W.Va. 619, 371 S.E.2d 340 (1988), the defendant was convicted for both breaking and entering and larceny. We held that such convictions did not violate double jeopardy principles, recognizing that breaking and entering and grand larceny are separate and distinct offenses for double jeopardy purposes. Even though the two offenses "occurred close in time," conviction for both offenses did not violate double jeopardy principles. *Id.* at 632, 371 S.E.2d at 353.

Similarly, in *State v. Drennen*, 185 W.Va. 445, 408 S.E.2d 24 (1991), we found no violation of double jeopardy principles where a defendant had been convicted of three separate offenses arising out of the same drug-dealing transaction. Although the marijuana was contained in only one container at the time of the defendant's arrest, the defendant had purchased the marijuana with joint funds of three juveniles and had delivered the marijuana to one of the juveniles in the presence of the other two. As we noted in syllabus point 1 of *Drennen*, " 'Although under double jeopardy principles the proper procedure is a trial of all offenses arising out of the same 'criminal transaction' jointly, separate punishments may be imposed for separate

---

1. The dissent sets forth these stereotypes, among others: most public defenders are "simply hacks"; assistant prosecutors are there for the "government coffee suck in lieu of more arduous, stress-laden and challenging work"; violent criminals are almost always poor and stupid; police officers almost always lie; most family-related pathologies are due in large part to a 73% female working population; parents who both work outside the home are self-absorbed and negligent; and the entire drug industry is fueled by sociopathic reckless youth from single-parent homes. (Archie Bunker lives again!)

offenses arising out of a single criminal transaction.' Syllabus point 3, *State ex rel. Johnson v. Hamilton,* 164 W.Va. 682, 266 S.E.2d 125 (1980) [*cert. denied,* 449 U.S. 1036, 101 S.Ct. 613, 66 L.Ed.2d 498 (1980)]." 185 W.Va. at 446, 408 S.E.2d at 25.

Finally, in *State v. George,* 185 W.Va. 539, 408 S.E.2d 291 (1991), we held that malicious assault and attempted murder of the same victim were different offenses for double jeopardy purposes because malicious assault required proof of serious bodily injury that would not be required for an attempted murder conviction. Attempted murder required proof of premeditation or lying in wait with specific intent to kill and an overt act toward commission of the crime. Thus, even though the two offenses arose out of the exact *same* transaction, they were two separate and distinct offenses for purposes of double jeopardy.

Justice Neely dissented in none of these opinions. Why, one may ponder, is the principle of multiple offenses arising from transactions close in time so objectionable to Justice Neely in the context of sexual offenses when he has concurred with the majority on similar criminal matters not involving sexual offenses?

One must also conclude that the dissenter puts his civil libertarian clothes on in a chameleon-like fashion because he essentially believes that a "grope" (as he so crudely describes it) is really a de minimis act. (One can almost hear him saying, "Just a grope ... what's the big deal?").

The dissent's reliance on assault cases is singularly misplaced simply because assault statutes do not attempt to differentiate the various methods by which an assault can be accomplished, as is the hallmark of our sexual offense statutes. This distinction was addressed by the majority. The dissent suggests that, because no penetration was involved, this shouldn't even be a sexual offense.

Perhaps a clue to why the writer of the dissent adopts such inconsistent positions can be found in his sweeping statement

that "when a defendant is accused of the current crime of fashion (any crime with the word 'sexual' in it), his constitutional rights cease to exist."

Such a statement is not only irresponsibly inaccurate, but the whole tenor of the dissent (which suggests that conviction in sexual assault/abuse cases is a foregone conclusion) reveals an abysmal lack of knowledge of the difficulty of these cases on the trial level. Lastly, the dissent's characterization of the other members of this Court as engaging in Gestapo-like tactics is a gross disservice to the whole appellate process in West Virginia. The true civil libertarian on this Court is the writer of the majority opinion.

NEELY, Justice, dissenting:

I dissent to the majority's holding in this case because it is contrary to the general law on double jeopardy and has led to an unjust result *for future cases.* Thus, I take the time to write this dissent in a case where no harm is done to the defendant (he is to serve his two sentences concurrently) because I believe that the majority's opinion is aiding and abetting a growing trend in American law to abolish civil rights and destroy citizens' right to trial by jury. Although this sounds like an hysterical over-statement[1], I hope through this opinion to sound a warning about what has been happening in federal courts—models to which the states have long looked as paradigms of judicial competence—and what is likely to follow in state courts.

Accordingly, this dissent is divided into three parts: Part I is my brief historical overview to show how the outrages I shall catalogue were allowed to occur. Part II is simply an analysis of how the majority in this case acquiesced in Gestapo techniques to achieve a "politically correct" result. Part III is an analysis of how such techniques as overcharging in both state and federal courts, and the federal sentencing guidelines, have virtually abolished criminal defendants' right to trial by jury. *Innocent* people now regularly *must* plead guilty because the system is so rigged

1. See Part II, note 2 discussing the majority's

cynical manipulation of the facts.

against them that they can't take the chance of a verdict by a jury of their peers!

## Part I

### The History

Violent crime is almost always committed by the poor, the uneducated, or the stupid. Crimes of passion are committed by everyone, of course, but a trial involving a middle-class man meticulously planning the murder of his wife, so he can collect the insurance and run off with his secretary, is sensational precisely because it is so rare. Traveling salesmen who spend their off-hours robbing all-night grocery stores, married schoolteachers who take nights off to rape sixteen-year-old girls, and prosperous farmers who eliminate market competition in the neighborhood by setting fire to their neighbors' barns are real oddities. Consequently, the entire criminal law system most often boils down to the powerful state with all its weapons—police, prosecutors, courts, prisons, and probation officers—going after poor, uneducated, stupid folks. (That is not to say, however, that the poor, uneducated, stupid folks did not commit the crimes.) This lower class of criminal suspects is not exactly possessed of enormous political power to protect their rights, particularly because when they are not on the receiving end of the whole system geared up to get it, they are the group in society crying most loudly for more law and order because it is the poor, the weak and the helpless who are disproportionately the *victims* of crime.

In the early 1960s, the average criminal defendant was treated like a piece of meat on its way to dressing and processing. A person was arrested, brought in for interrogation (seldom conducted in a gentlemanly manner), threatened with the many dire consequences that awaited him if he did not cooperate (such as a thirty-year sentence for simple burglary), and encouraged to plead guilty. Of course a lawyer could do wonders for him, but ordinarily there was not any lawyer and would not be any lawyer unless he came up with the money to hire one or was accused of a capital crime. For those who knew enough to make a scene and demand to have a court-appointed lawyer, a lawyer might be appointed, but it was frequently the case with overworked courts that the judge indicated either outright, in open court but off the record, or through hints delivered informally by third parties that things would go a lot easier for the defendant if he would plead guilty rather than make a lot of trouble asking for a lawyer and demanding a jury trial. If a person pleaded guilty, that was it—off he went to prison, having waived all grounds for appeal except the jurisdiction of the court, and he just sat in prison until the sentence expired or the parole board released him. Often this process ran an entirely innocent man through its machine—a man so frightened of the circumstantial evidence against him that he would agree to plead guilty to a lesser offense or to confess to a crime he did not commit in the hope of receiving more lenient treatment from a system that was going to get him anyway.

It usually happened that in any small town or city where this particular form of expedited due process occurred all the participants were friends, buddies, and colleagues. The sheriff, prosecutor, and judge were probably all members of the same political party who exchanged fishing stories together over lunch down at the jail, while the prisoners served them a subsidized meal, and because each official in any county courthouse has some power over other officials in the courthouse, the tradition in my childhood was live-and-let-live because: "You've got to go along to get along!" Almost everywhere prosecutors, sheriffs, and judges were elected and their staffs were not civil service, so that they presented no counterbalance to the alliances of party politics. Furthermore, criminal trials were expensive and a lot of work for everyone concerned, and because the judge, the prosecutor and the sheriff were not paid by the case, real due process took money away from payrolls for relatives and a lot of time away from the farm and the trout stream.

Not only was the system a fiasco at the interrogation, pretrial confinement, and guilty plea stages of the process; it resem-

bled some of the more unpleasant features of Nazi Germany or Communist Russia in the investigative stages. Men were routinely picked up off the street without a warrant, brought down to the police station, left to sit on hard benches without access to water, food, or sometimes even a working restroom for hours at a time before "questioning," which frequently involved humiliating insults and a good bit of slapping around. In many cases, the police had nothing more to direct them to their particular suspect than a prior criminal record, the "suspicious behavior" of the arrested person, or personal animosity. The entire "questioning" process went on without any regard for the person's need to be at his job, his school, his wife's side in the hospital, or anywhere else. The convenience of the authorities organized the lives of those without power who came to the authorities' attention. And who was available to give redress? The political process, where most aspirants for office run on a "crack down on crime" platform? The local judge, who would need to dress down the local sheriff or police chief in the morning before they all went out for lunch together? The executive authority, whose very henchmen all these rights violators were? Not very likely.

However, the parade of horrors did not end there, for there was the entire area of search and seizure to be abused. It often happened that when the police came to search a house in the 1960s, their routine procedure involved turning out dresser or desk drawers, making holes in the wall, ripping apart all the beds, tearing up the pillows, kicking down the doors of locked closets and cabinets, and rousting people from their night's slumber. Again, what recourse did a victim have? The political process? See above. A damage suit? Only if the victim could afford a lawyer and could find one willing to take on the incumbent local political machine with which the lawyer was compelled to work every day. Furthermore, given the generally high regard that the middle class accords the police, the likelihood of a substantial jury award (which then had to be the unanimous judgment of *twelve* persons) being recovered against the police by a group of suspicious-looking and unsavory people involved in criminal activities was remote. Of four damage actions filed in Marion County, West Virginia, in 1970 against a group of Caligulaesque state troopers who routinely beat the patrons of local beer joints, none resulted in a damage award by a jury. Police officers routinely lie, particularly to save their own skins, and when they do, they make enormously credible witnesses.

The institutional abuses of the criminal justice system that I have just described created substantial unnecessary and unmerited suffering, seriously reduced the degree of personal liberty among people of particular socioeconomic and racial backgrounds, and generally got worse rather than better as society became more urbanized and people were increasingly without the financial, emotional, and political support of an extended family. The U.S. Supreme Court and other federal and state courts, consequently, began the widespread development of "constitutional" principles to correct these institutional abuses. The Supreme Court recognized that the traditional damage award against responsible officials, which for over a hundred years had been the mythical remedy for invasions of personal rights, simply did not work and that some other remedy was necessary that could be automatically applied by the courts without jury intervention to hurt the system enough to force it to change its ways.

And so it came to pass in the early 1960's that the Supreme Court of the United States, led by Chief Justice Earl Warren, began its wholesale revision and "nationalization" of the rules of criminal procedure using vague clauses of the Bill of Rights as the lever. Enter, then, the "exclusionary rule"—a new, judge-made, constitutional remedy unknown to many state courts. According to this ingenious doctrine, if the police failed to comply with any of the new rules concerning procedure, any evidence gathered during a period when the rules were being violated was to be excluded from all court proceedings. For example,

evidence could be excluded that the suspect himself gave the police if the police failed to warn the suspect of his right to remain silent, his right to retain counsel of his choice before he was asked any questions, and his right to court-appointed counsel if he could not afford to hire a lawyer on his own. Usually the evidence excluded because the police failed to give the proper warnings or otherwise observe the suspect's rights made the difference between a conviction and an acquittal, and the defendant went free. The exclusionary rule also applied to questions of search and seizure: If the police entered a person's house without a proper warrant and discovered exactly what they thought would be there, none of the evidence could ever be used in court, because all the evidence was tainted by the violation of the suspect's "constitutional" rights.

The streets began to swarm with released criminals. All the agents of the criminal justice system concluded that the courts had finally gone stark raving mad and envisaged a world of wall-to-wall felons. At first, police officers and prosecutors did not believe that the U.S. Supreme Court meant what it said, so they continued to do business as usual, and the Supreme Court itself was forced to reverse hundreds of convictions, release the accuseds, and over a span of ten years indicate that it was serious about individual rights.

Meanwhile, what was going on back at the station house? The police and prosecutors were sitting around saying, "Son of a b——!" (policemen are known to say this on occasion) and feeling very insecure about their jobs. Many criminals were on the streets because of criminal procedure violations, which was leading irate citizens to talk about "changes of administration" and "department reform." Oddly enough, jury damage suits, constitutional mandates, the elective political process, and general notions about unmerited suffering and consideration for one's fellowman could not clean up the system, but the fear of unemployment managed it very neatly. Suddenly police departments sponsored training programs to instruct their members where and when a warrant was necessary to make a

lawful arrest or what extraordinary circumstances—such as a felony committed in the presence of an officer—justified an arrest without a warrant. Officers began carrying cards with the official warning (known as the "Miranda warning" from the *Miranda v. Arizona* case in 1966), so they would not make an error in informing defendants of their rights to remain silent and to have a lawyer appointed if they were indigent. At the same time, lower state courts instituted systems to appoint lawyers for criminals in all prosecutions, both felony and misdemeanor, where there was any possibility of a jail sentence, and state legislatures appropriated money to pay private lawyers to serve as court appointees or to pay for public defender systems. The courts not only required that those being prosecuted be represented by counsel, but also that they be represented by "competent" counsel, which meant that appointing some hack who, but for court appointments, was such a dud that he would not otherwise find work no longer was supposed to pass muster.

Since it was no longer permissible to obtain confessions by intimidating a suspect, keeping him all night without an opportunity to use the bathroom, depriving him of food for long periods of questioning, or subjecting him to dire threats for failure to testify against himself, the police had to think of new ways to solve crimes. It dawned on them that investigation, regular patrols, and scientific laboratory analysis of clues á la Sherlock Holmes might substitute for some of their cruder techniques, so they inaugurated training programs in these areas as well. When they were unable to finance necessary new equipment, the federal government came to the rescue with cash grants and other help from the Law Enforcement Assistance Administration (LEAA).

As the U.S. Supreme Court ruled that there must be no substantial delay between an arrest and appearance before a magistrate for the setting of bond, along with formal court-administered instructions concerning appointment of counsel, states began reorganizing their judiciaries so that

the tobacco-chewing, one-gal, illiterate justice of the peace who refused to hold court during squirrel season, deer season, after 5 p.m., or on weekends became a thing of the past. In his place appeared a professional lay or lawyer magistrate with extensive state-sponsored training, who was part of a pool of minor judicial officials available at a moment's notice around the clock to set bond, issue warrants, and otherwise mete out justice according to a modern concept of individual rights. Furthermore, since everyone feared that the nature and conditions of pretrial confinement would be raised in court, the more inhumane aspects of local incarceration facilities were eliminated, and a nationwide program of upgrading criminal detention facilities was promoted.

So far I have catalogued the positive side, but there was a negative side as well. The negative side was that lots and lots and lots of dangerous, brutal, violent sociopaths were released back into society through the operation of the exclusionary rule, and no sooner did they depart custody but that they robbed, murdered, raped and burned again and again and again. Although the ordinary citizen favored the expansion of civil liberties in general, he or she became outraged over the specifics when truly evil defendants were released on mere "technicalities."

And here, since I am talking for the historical record, I shall admit that I have always applied the exclusionary rule with surpassing reluctance and sought every possible technicality to avoid applying technicalities. My first question has always been: "Is the guy guilty?" Therefore, if the judges who administered the system crafted in the 1960's and early 1970's by the Warren Court were ambiguous about the legitimacy of the system that had been designed to protect civil liberties at the expense of citizen safety, how much more ambiguous or, as frequently, outright hostile were ordinary citizens?

By 1980 three separate historical developments converged: First, the general public turned against a system of criminal law that appeared to look *last* to the question of whether the defendant was guilty and appeared more interested in "coddling criminals" than it did in protecting innocent, hard working citizens. Second, illegitimacy rates were soaring, divorce was soaring, and the number of families with self-absorbed, negligent parents who both worked outside the home was soaring; consequently, family-structure-related pathologies were creating a rapidly expanding underclass of increasingly savage people. And, third, the drug problem entirely changed the face of American crime.

Because of drugs, gangs are no longer groups of bored teenagers engaged in petty crime; teenage gangs are now the distribution network of a state-of-the-art, billion dollar industry. A typical Los Angeles street gang may have two hundred members between thirteen and twenty-six years old, and each gang will typically move between twenty-five and forty kilos of crack or cocaine a month. In Los Angeles County there are roughly 600 such gangs, accounting for over 70,000 active members. Although most gangs are either black or Hispanic, there are Asian, Samoan and white gangs as well. Even now, as urban markets become saturated, our small cities, suburbs and rural towns are being invaded by big-city dealers who are much more violent than the local criminals the police have been accustomed to handling.

In Martinsburg, West Virginia, for example—a town an hour and a half away from Washington by car, state and federal police arrested forty-six suspected drug dealers in 1986. All along the rural corridor that parallels Interstate 95 from Florida to New York, the Jamaicans have cornered the crack cocaine network. Small Town, U.S.A., offers easy profits to drug dealers at low initial risk because rural communities lack the drug awareness of big cities and are even less prepared than their urban counterparts to cope with naked savagery. Local police forces can be easily overpowered and even more easily corrupted.

The unusual violence associated with all aspects of the drug business arises from a sinister combination of money, readily

available hi-tech weapons and an utterly savage underclass willing to use both without scruple. The entire drug industry reflects the sociopathic recklessness of teenagers and young adults largely from single-parent families whose poverty and deprivation have immunized them to both hope and fear; they exhibit a casual acceptance of—and sometimes enthusiasm for—torture, murder, "drive-by" shootings and public mayhem. In Florida the multi-billion dollar drug industry dwarfs all other industries, including agriculture and tourism.

This type of activity is not unique to South Florida. In February 1989, the Detroit News published a copyrighted story showing that Detroit police officers were alleged to have committed 151 crimes each year for every 1,000 officers. Allegations, of course, are cheap, but the Detroit News, availing itself of the Michigan Freedom of Information Act, found out that there were 7.2 substantiated allegations against officers in Detroit for every 1000 officers.

Other cities surveyed for police corruption were New York, with 112.7 allegations per 1,000 officers; Los Angeles, 109.5; Dallas, 65.6; Houston, 42.7; Philadelphia, 20.7; Chicago, 13.6; and Phoenix, 10.7. Houston finished first in substantiated allegations, with 12.7 per 1,000 officers; then followed Dallas, with 10; Los Angeles, 9.5; and New York, 7.5. Crimes by police a few years ago usually involved using excessive force. Now Detroit officers have been accused of rape, hiring an arsonist to set fire to an occupied apartment building, car theft, insurance fraud, cocaine and heroine possession, armed robbery, selling gun permits, concealing stolen property and hiring a contract killer.

It is probably fair to say that for every substantiated instance of police misconduct, there are likely to be five to ten more that were either not reported or not satisfactorily substantiated. The police are notorious for protecting one another, and notwithstanding the dedicated efforts of police internal affairs departments, investigating police corruption still presents the problem of goats guarding cabbages.

Increased instances of police corruption, of course, are directly related to the drug industry. Being a corrupt policeman has perils that must be offset for an officer to risk his career, pension, and a term in prison. Unlike profits from ordinary crime, however, drug profits are big enough to turn the head of all but the most honest officers. And there is more than enough drug money to go around: Most of an officer's friends and associates will be sufficiently involved that no one is inclined to blow the whistle. Involvement may not include selling drugs or tipping off dealers; just protecting a friend's bar where drugs are sold is sufficient involvement to discourage an officer's moral outrage. In such an atmosphere the lone whistle-blower is likely to have a fatal accident.

People who sell drugs are usually involved in other criminal activities. Consequently, once an officer becomes involved with drug dealers—perhaps justifying his conduct on the theory that the dealers are engaged only in "victimless" crime—it is an easy step to collaborating in other criminal enterprises.

Drugs, then, have made prosecutors popular and civil liberties unpopular, and our family-related pathologies—widespread illegitimacy, a fifty percent divorce rate, men living with two or three generations of women to whom they are not married, and a female labor force participation rate nationwide of seventy-three percent (so that most neighborhoods today are devoid of any adult presence during all the weekday hours children are home from school)—have made child abuse, sexual abuse, rape, incest, and related crimes extraordinarily fashionable to prosecute. Thus, in the case before us, we see what has become a traditional prosecutorial tool to avoid jury trials and coerce *suspects*, namely wildly excessive overcharging, accepted and even applauded by this court, as shown by the majority's opinion.

### Part II
### The Bending of the Law for Fashionable Ends

On 21 June 1990, C.D. was walking along Seventh Street in Parkersburg when she

was accosted by the appellant, Ronald Dean Rummer. A few moments earlier, Ms. D. had spotted Mr. Rummer following her slowly in his car while she walked. After circling the block, Mr. Rummer parked his car, got out and chased Ms. D. until he caught up with her. Appellant then stuck one hand between the victim's legs and his other hand up the victim's blouse and said "Baby, I want to screw you." In the process, the victim tripped and both the victim and Mr. Rummer tumbled to the ground. The victim then broke free, ran down the street, and called the police.[2]

Appellant was charged with two counts of first-degree sexual abuse under *W. Va.* Code 61–8B–7 [1984]; one count for touching Ms. D.'s breasts, and one count for touching her sex organ. The jury convicted him on both counts, and the circuit court sentenced him to concurrent terms of one to five years in prison. I dissent because the conviction on both counts of first-degree sexual abuse violates double jeopardy provisions of both the West Virginia and United States *Constitutions.*

### A.

Appellant's main assignment of error is that his conviction on two counts of first-degree sexual abuse under *W. Va. Code* 61–8B–7 [1984] violates constitutional protections against double jeopardy.[3] The fact

**2.** I note that the majority, in its recital of the facts, interpreted the facts to include a second sexual incident when Mr. Rummer fell on top of the victim and he "again roughly fondled her breasts through her shirt with both hands." Slip op. 2. However, the majority's description of an alleged second sexual incident is not based on the testimony of the victim who testified to the following description of the entire incident:

> Q Now, you—what did he first do to you?
> A Well, like I was saying, whenever I went to turn the next time he grabbed me. And he had—just kind of like—he put his arm up in between my legs. And, you know, I was telling him to stop and, you know, I was telling him to get away from me and yelling at him and all. And—
>
> . . . . .
>
> A Well, he grabbed me and he started like hunching up against my body. And—
>
> . . . . .
>
> [H]e was saying, you know—he was trying to get up my shirt and stuff. And he didn't get up my shirt because I was pushing his arms away. But he was saying like—he, you know, he—
>
> . . . . .
>
> A And like I had said, whenever he grabbed me from behind, you know, he was rubbing in between my legs real hard. And I was trying to get away from him. And so that's when he started hunching and saying, you know, "Baby, I want to screw you." And he said it a couple times. And—
> Q Did you stay standing up or what happened?
> A No. Somehow we got—I—it was like we got tripped to the ground. I can't recall exactly how it happened, if I tripped him or he tripped me. But we fell, and he—
> Q Were you on the sidewalk or the ground or where?

> A Yes, the side—it was on the sidewalk on the ground.
> Q How did you land? Who was on top?
> A He was.
> Q Were you face to face, back to back or side to side or what?
> A No, like face to face because—but—
> Q Did you look up in his face at that point?
> A Yes.
> Q And how long did you stay in that position when you were looking up to his face?
> A Not very long because I was just trying to get him off of me. I was—you know, I was just wanting him off of me so I could go because I wanted to get away. I kept yelling at him to stop. I didn't want him, you know—telling him—I said—I just come right out and said to stop, you know, quit doing it.
> Q How long were you face to face like that?
> A A few seconds.

**3.** Article III, § 5 of the West Virginia *Constitution* provides, in part: "No person shall be . . . twice put in jeopardy of life or liberty for the same offense."

Amendment V of the U.S. *Constitution* provides, in part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. . . ."

The Fifth Amendment double jeopardy clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. [Footnotes omitted.]" *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *accord, Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *State v. Pizzuto,* 119 Idaho 742, 756, 810 P.2d 680, 694 (1991).

We have held that the West Virginia *Constitution* provides identical protection:

> The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution,

that the multiple convictions resulted in concurrent sentences does not render the double jeopardy issue moot.[4]

*W.Va.Code* 61–8B–7 [1984] provides, in part:

(a) A person is guilty of sexual abuse in the first degree when:

(1) Such person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion.

The Legislature defined "sexual contact" in *W.Va.Code* 61–8B–1(6) [1986]:

"Sexual contact" means any intentional touching, either directly or through clothing, of the anus or any part of the sex organs of another person, or the breasts of a female or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.

In Syl. pt. 8 of *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983), we adopted the *Blockburger* test[5] for determining whether multiple convictions arising from the same transaction violate double jeopardy protections:

Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact the other does not.

However, this test is not necessarily dispositive of the issue of multiple punishments for the same offense. In *State v. Miller*, 175 W.Va. 616, 336 S.E.2d 910 (1985), we noted that even though the *Blockburger* test is technically met by separate convictions for kidnapping and first-degree sexual assault (each requires proof of a different fact), if the kidnapping is

merely incidental to the sexual assault, then double jeopardy would bar conviction and punishment for both offenses. As we held in Syl. pt. 4, *State v. Reed*, 166 W.Va. 558, 276 S.E.2d 313 (1981):

Double jeopardy prohibits multiple punishment for the same offense, therefore under our criminal sexual conduct statute, *W.Va.Code*, 61–8B–1, *et seq.* [1986], a single sexual act cannot result in multiple criminal convictions.

We held similarly in *Fortner*, 182 W.Va. at 363, 387 S.E.2d at 830:

[W]here the evidence shows only one continuing sexual offense culminating in a single act of sexual intercourse, conviction and punishment of the accused for unlawful sexual behavior entirely ancillary to such sexual intercourse violates double jeopardy.

A comparison of *Fortner* and *Reed* shows the intricacies of double jeopardy protections that the *Blockburger* test cannot adequately handle. In *Fortner*, the defendant was charged with ten counts of second-degree sexual assault, ten counts of first-degree sexual abuse, two counts of conspiracy, and one count each of kidnapping and abduction with intent to defile; *Reed* involved a situation where the defendant was charged with separate counts of sexual assault, sexual abuse and sexual misconduct. Although the circumstances in both *Reed* and *Fortner* passed the *Blockburger* test, we found a double jeopardy violation for the convictions for acts incident to the sexual assault, but we did not find any error in *Fortner* for separate convictions involving separate acts in different locations at different times. We dealt with our unease at the lack of guidance we received from the *Blockburger* test by limiting the rule of *Reed* to ancillary acts relating to single acts of penetration:

---

provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense.
Syl. pt. 1, *Conner v. Griffith*, 160 W.Va. 680, 238 S.E.2d 529 (1977).

4. *See State v. Fortner*, 182 W.Va. 345, 360, 387 S.E.2d 812, 827, n. 12 (1989) ("The fact that these convictions resulted in concurrent sentences does not render the double jeopardy issue moot").

5. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

It is important to explain that this holding is limited to the facts of this case. Here the sexual contact demonstrated at trial was ancillary to one act of sexual intercourse. We are not confronted with two acts of sexual intercourse, nor are we confronted with an act of sexual intercourse and then an act of sexual contact separated by some period of time. It would appear to the court that unlawful sexual intercourse could not possibly occur without a certain amount of sexual contact and it seems unreasonable to us that the Legislature contemplated the division of one act of rape into its component elements for the purposes of punishment. [Footnote omitted.]

*Reed*, 166 W.Va. at 568–569, 276 S.E.2d at 320.

Such *ad hoc* departures from the *Blockburger* test show that in the area of sexually assaultive behavior, the test fails to clarify when a conviction on multiple counts for essentially the same offense violates double jeopardy protections. It has become easier for courts to cite the *Blockburger* test and then use it as a pretext for their decisions than to determine whether multiple convictions in a given instance violate double jeopardy principles. Reliance on this type of jurisprudence gives us only anecdotal comparisons to prior cases; it does not give us a framework with which to determine whether the double jeopardy protections have been violated in this case.

Many courts in other jurisdictions that have grappled with these issues have come to the same conclusion. The New Mexico Supreme Court, in *Swafford v. State*, 112 N.M. 3, 9, 810 P.2d 1223, 1229 (1991), identified the limited utility of *Blockburger*:

> While early manifestations of the *Blockburger* test indicated that the test may well have been a constitutional test for determining the sameness of two offenses, later decisions by the [United States Supreme] Court have retreated substantially from that position. Beginning with *Prince v. United States*, 352

U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957) (examining legislative history of Federal Bank Robbery Act for indicia of intent to permit multiple punishment), the Court repeatedly has stated that the question of whether punishments are unconstitutionally multiple depends on whether the legislature has authorized multiple punishment. *See, e.g., Whalen v. United States*, 445 U.S. 684, 688–89, 100 S.Ct. 1432, 1435–36, 63 L.Ed.2d 715 (1980). Indeed, where the legislature has explicitly authorized multiple punishment the judicial inquiry is at an end, multiple punishment is authorized and proper, and the *Blockburger* test is irrelevant. *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983).

After examining the limitations of the *Blockburger* test, the court went on to develop a more comprehensive two-part test for determining the validity of multiple punishments for the same conduct:

> The first part of our inquiry asks the question that Supreme Court precedents assume to be true: whether the conduct underlying the offenses is unitary.... The second part focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses. Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial.

*Swafford*, 112 N.M. at 13, 810 P.2d at 1233. Because the two-part *Swafford* test examining the nature of the conduct and the legislative intent to create separate punishable offenses is more comprehensive, this test should have been adopted by the majority.[6]

The Wisconsin Court of Appeals in *Harrell v. State*, 88 Wis.2d 546, 277 N.W.2d 462 (1979), after analyzing the factors that courts have used to decide similar cases, developed a more specific framework that is useful in analyzing the unitary conduct question:

**6.** The majority notes that the *Swafford* "approach is entirely consistent with" their approach; however, their "politically correct" re- sult can only be reached by ignoring *Swafford.* Op. at 378, 432 S.E.2d at 48.

In our analysis of reported cases, we have been able to identify the following: (1) nature of the act; (2) time; (3) place; (4) intent; (5) cumulative punishment; (6) muscular contraction; and (7) number of victims. The presence or absence of a single factor or a combination of factors other than the nature of the act is not conclusive of the issue.

*Harrell*, 88 Wis.2d at 572, 277 N.W.2d at 472–473. We have applied many of these factors in deciding cases such as *Reed, Fortner*, and *Miller*, and the majority should have adopted this framework to determine when conduct is unitary.[7]

When the factors listed in *Harrell* are applied to the circumstances of this case, they conclusively prove that the conduct was in fact unitary.

### B.

#### 1.

### NATURE OF THE ACT

It is clear that in cases where there are multiple penetrations the victim's different orifices, whether of mouth, vagina, or anus, a separate conviction is valid for each penetration. As the Oregon Court of Appeals held in *State v. Steele*, 33 Or.App. 491, 499, 577 P.2d 524, 528 (1978), *review denied* 285 Or. 195 (1979) (quoted in *Harrell v. State*, 88 Wis.2d 546, 567–568, 277 N.W.2d 462, 470–471 (Wis.Ct.App.1979)):

> We do not believe that the convictions for oral and anal sodomy in the first degree merge as constituting but one crime. The victim was exposed to additional fear, humiliation and danger during the second sodomy. We see no reason why we should hold that a man who commits one sodomy may do so again and again to the same victim with impunity. [Citations omitted.]

We agree with that reasoning and have previously made the same holding:

> Where a defendant commits separate acts of our statutorily defined term "sexual intercourse" in different ways, each

act may be prosecuted and punished as a separate offense.

Syl. pt. 2, *State v. Carter*, 168 W.Va. 90, 282 S.E.2d 277 (1981). *Accord, Johnson v. State*, 762 P.2d 493, 495 (Alaska App.1988) ("Separate convictions for multiple acts of penetration involving different openings of the victim's or the defendant's body are permissible"); *People v. Johnson*, 406 Mich. 320, 279 N.W.2d 534 (1979).

However, a close examination of the act in this case shows us that the analysis used in the penetration cases (such as *Reed* and *Carter*) does not fit. Appellant committed one grope in which he made contact with victim's breast and sex organ, but he did not repeatedly choose to violate the victim's body at different identifiable times. Indeed, first-degree sexual abuse is an aggravated form of battery that has heightened penalties due to the sexual overlay. This case is more akin to battery cases than to penetration cases. *See People v. Berner*, 42 Colo.App. 520, 522, 600 P.2d 112, 113 (1979) (holding that two blows struck in a ten minute fight "were not separate transactions but were part of a single criminal transaction arising from a single impulse"); *People v. Wilson*, 93 Ill.App.3d 395, 397, 48 Ill.Dec. 744, 745, 417 N.E.2d 146, 147 (1981) (finding "inane" the argument that each blow constituted a separate crime of aggravated battery and attempted murder). *Accord, Weatherly v. State*, 733 P.2d 1331, 1336–1337 (Okla.Crim.App.1987). The double jeopardy limitations on multiple battery convictions is clear: Each blow by a single defendant upon a single victim in one contemporaneous transaction cannot serve as a basis for multiple convictions for battery.

When examining the nature of the act here—one grope that was over in a few seconds—the appellant's conduct is much closer to battery than penetration. Accordingly, the unitary nature of the appellant's act militates against multiple convictions of first-degree sexual abuse. Although the nature of the act is perhaps the strongest factor for determining unitary conduct, this

---

**7.** Although the majority mentions several of the *Harrell* factors in their application of the *Blockburger* test, their piecemeal approach fails to provide a systemic framework that would guide both prosecutors and lower courts in future cases.

factor is not necessarily dispositive and, therefore, I examine the next most important factors, time and place.

### 2.
### TIME AND PLACE

In *Harrell,* the court described the appropriate method for evaluating the time element of sexually assaultive behavior:

> The greater the interval of time between acts constituting an episode of sexually assaultive behavior, the greater the likelihood of separate offenses. That the interval is merely minutes or even seconds, as with the other elements and factors discussed, cannot be a solely determinative factor.... An episode of sexually assaultive behavior can and usually does involve multiple invasions of the intimate parts of the victim's body. Whether such invasions are a single offense or separate offenses can sometimes be placed in perspective by the time interval between specific acts.

*Harrell,* 88 Wis.2d at 572–573, 277 N.W.2d at 473.

The place element is strongly related to time. If a defendant grabs a woman in a parking garage by the breasts and says "Baby, I want to screw you," drags her into a nearby stairwell and puts his hand between her legs and rubs before she can run away, then the different places (garage for one contact and stairwell for the other contact) would be a significant factor that would support two separate convictions. An interruption in contact, either in time or space, followed by a resumption indicates the occurrence of two offenses.

However, no such interruption of either time or space occurred here. The entire episode lasted, according to the victim's testimony, only "a few seconds." [8] Furthermore, contact with both the victim's breasts and sex organ happened simultaneously. Similarly, all contact took place in one place, on Seventh Street in Parkersburg. No interruption in either time or place occurred (even under the majority's statement of facts), further indicating that only one conviction for first-degree sexual abuse is appropriate.

### 3.
### INTENT, MUSCULAR CONTRACTION AND NUMBER OF VICTIMS

"The defendant's intent, as evidenced by his conduct and utterances, to sexually abuse or obtain sexual gratification from his victim may demonstrate his desire for differing and separate means or acts of abuse or gratification." *Harrell,* 88 Wis.2d at 574, 277 N.W.2d at 473. Obviously the passing of time between events may be an indication of intent; the moving of a victim and renewal of an assault may also indicate intent. Furthermore, a defendant by his statements or separate concentration (e.g., starting his contact on the breasts and after a time shifting focus to the sex organ) may show that he intends to commit multiple offenses. This is why the multiple penetration cases are treated differently from battery cases: each penetration is *prima facie* evidence of a new intent to invade the victim's body. *See Carter, supra; Fortner, supra.*

Another way of viewing the multiple penetration distinction from battery is on the "muscular contraction" principle: If a defendant consciously chooses to commit a separate act (e.g., pulling the trigger on a gun twice) he must have intended to commit two acts. In penetration cases, the fact that a defendant consciously moved his sex organ to insert it into a second or third orifice is further evidence of intent to commit two crimes.[9]

---

**8.** Although the majority cites *State v. Williams,* 105 N.M. 214, 730 P.2d 1196 (1986) as presenting "facts almost identical to those presented here", *Williams* concerned two "distinctly separate touchings" that occurred "during a time span of less than 5 minutes." Op. at 377–78, 432 S.E.2d at 47–48.

**9.** Similarly, if a defendant attacks two or more victims, he has indicated an intent to harm each person and therefore, multiple convictions for multiple victims do not violate double jeopardy protections. *See,* Syl. pt. 2, *State ex rel. Watson v. Ferguson,* 166 W.Va. 337, 274 S.E.2d 440 (1980) ("Where multiple homicides occur even though they are in close proximity in time, if they are not the result of a single violative act of the defendant, they may be tried and punished separately under the Double Jeopardy Clause of

However, the appellant did not separately attack different parts of Ms. D.'s body; he did not express any intent separately to abuse various parts of Ms. D.'s body; rather, he committed one "few second" grope that simultaneously made contact with the victim's breasts and sex organ. Although the appellant intended to cause "sexual contact" with the victim, he did not intend to cause multiple contacts. This lack of intent makes the appellant's dual convictions for sexual abuse violate his constitutional protections against double jeopardy.

### 4.

### CUMULATIVE PUNISHMENT

Because the appellant was sentenced to concurrent terms, the factor of cumulative punishment is minor in this case. However, it is possible that the two convictions might influence the decision of the parole board. If the punishments imposed were severely disproportionate to the crime it should weigh more heavily as a double jeopardy concern or even as a disproportionate punishment under Article III, Section 5 of the West Virginia *Constitution. See, State v. Glover,* 177 W.Va. 650, 355 S.E.2d 631 (1987); *Wanstreet v. Bordenkircher,* 166 W.Va. 523, 276 S.E.2d 205 (1981) (limiting the application of the proportionality protection to gross disproportions).

### 5.

### CONCLUSION OF UNITARY CONDUCT ANALYSIS

After applying the *Harrell* framework to this case, the conclusion should be inescapable that appellant committed a unitary act and, therefore, I next examine the legislative intent, to see whether the Legislature intended to allow multiple punishments for this unitary conduct.

### C.

Until today this Court had not squarely addressed the issue of whether conviction on multiple counts of sexual abuse stemming from one incident that lasted a few seconds violates double jeopardy. Unfortunately, in deciding this issue, the majority forgot its obligation to read statutes "with the saving grace of common sense." *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955).[10] In *Reed, supra,* we found it unreasonable to divide one act of rape into its component elements; it seems even more unreasonable that the Legislature wanted the courts to stand as a referee in a wrestling match counting the number of contacts to various body parts in a single incident that lasts a few seconds.

The State maintains (and the majority agrees) that the convictions in this case are not multiple convictions for the same offense, but rather that the statutory definition of "sexual contact" in *W.Va.Code* 61–8B–1(6) [1986] actually defines three different offenses: unwanted contact with the anus, unwanted contact with the breasts, and unwanted contact with the sex organ. As support, the State points to our rule permitting two convictions in situations where a defendant penetrated both the mouth and anus of the victim. The majority ignored the "saving grace of common sense" by not noticing the difference between this case and the penetration cases. The majority has yielded to popular blood lust for those who commit a crime of fashion: If a crime has "sexual" in its title, defendants automatically lose all rights. As I pointed out above, the multiple convictions upheld in the penetration cases rested on the fact that each penetration was a separate and independent act, not that the definition of "sexual intercourse" in *W.Va.*

Article II, Section 5 of the *West Virginia Constitution.*")

**10.** In *Bell,* the U.S. Supreme Court also created the "rule of lenity":

When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal

unit. When Congress leaves to the judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.

*Bell,* 349 U.S. at 83, 75 S.Ct. at 622. The majority seems to have forgotten that we have adopted this rule of lenity as well. *Reed,* 166 W.Va. at 568, 276 S.E.2d at 320.

*Code* 61–8B–1(7) [1986] allows conviction for penetration of either the vagina, mouth or anus.

Not only does the majority's reliance on legislative intent to justify its decision lack "common sense", it lacks coherence as well. The majority begins by stating that it will rely on legislative intent to aggregate sentences only if "the legislature has made a *clear expression* of its intention." Op. at 375, 432 S.E.2d at 45 (quoting Syl. pt. 8, *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992)). The majority quickly abandons this requirement of legislative clarity for a murky, divorced-from-reality analysis of the word "or." A brief review of this "analysis" will clearly reveal its absurdity.

The majority's "analysis" starts with a quote from *State v. Carter* saying that the use of the word "or" makes it "apparent that the Legislature chose to broadly define the term 'sexual intercourse' so that it would cover a variety of sexual encounters." Op. at 376, 432 S.E.2d at 46. The majority goes on to state that the use of "or" is "clearly designed to separate the various acts that may constitute 'sexual contact.'" Op. at 377, 432 S.E.2d at 47. That makes sense: The Legislature wanted broadly to define *the conduct* that would violate the statute. But then, the majority loses all coherence by concluding that the Legislature's intent to define the crime broadly led the Legislature in fact *to define three different crimes*, rather than three different ways of committing the same crime.

This Court rejected the majority's argument in this very regard in *Pyles v. Boles*, 148 W.Va. 465, 135 S.E.2d 692 (1964). In *Pyles*, the question was whether *W.Va. Code* 61–2–14a [1933] [11] defined several discrete offenses or one offense of kidnapping. In *Pyles*, this Court held that "it is clear that the statute ... creates a single capital offense and not ... three separate and distinct offenses." *Pyles*, 148 W.Va. at 476, 135 S.E.2d at 699. What would the majority be holding today if the defendant were appealing his conviction because the indictment charged him with "sexual contact" without picking either the breasts, anus or sex organ? Would they be freeing the defendant, or would they be concluding that the code defines one offense? I believe that Mr. Rummer would remain convicted! The majority is being disingenuous in its reliance on the argument that the Legislature's use of "or" defines separate offenses.[12]

In *Sisson v. State*, 528 So.2d 1159 (Ala. 1988) the Alabama Supreme Court addressed a similar statutory constitution question involving their driving under the influence code provisions. The *Alabama Code* 1975 § 32–5A–191 stated that "(a) A person shall not drive or be in actual physical control of any vehicle while: (1) There is 0.10 percent or more by weight of alcohol in his blood; [or] (2) Under the influence of alcohol." *Sisson*, 528 So.2d at 1161. The court held that subsections (a)(1) and (a)(2)

**11.** *W.Va.Code* 61–2–14a [1933] provided, in part:

> If any person, by force, threat, duress, fraud *or* enticement take, confine, conceal, *or* decoy, inveigle or entice away, *or* transport into *or* out of this State *or* within this State, *or* otherwise kidnap any other person, for the purpose *or* with the intent of taking, receiving, demanding *or* extorting from such person, *or* from any other person *or* persons, any ransom, money *or* other thing, *or* any concession *or* advantage of any sort, *or* for the purpose *or* with the intent of shielding *or* protecting himself *or* others from bodily harm *or* of evading capture *or* arrest after he *or* they have committed a crime, he shall be guilty of a felony. [Emphasis added.]

**12.** Footnote 16 of the majority's opinion reveals the absurdity of their analysis of the statute.

The majority acknowledges that a battery analysis might be appropriate in a situation where "the defendant touched both of the victims breasts at the same time." Op. at 379, 432 S.E.2d at 49 n. 16. The majority would then have the courts and the prosecutors looking to the offense as a whole if there is contact with breasts, but to counting the number of contacts (and convicting the defendant of a separate crime for each touch) if contact is made with the breasts and the sex organ. It doesn't take a lawyer to realize the absurdity of the majority's analysis; unfortunately, only a lawyer could come up with such a scheme. This is not the basis for a rational criminal justice system; the majority should not go out of its way to create an irrational legislative scheme where the plain reading of the code produces a rational offense-based scheme.

are "merely alternative methods of proving the same crime, and, therefore, [do] not constitute separate offenses." *Sisson,* 528 So.2d at 1162. *Accord Hogan v. State,* 178 Ga.App. 534, 343 S.E.2d 770, *cert. denied* (1986).

The reasoning of *Pyles* and *Sisson* is far more persuasive and applicable to the present case than the majority's tortured abuse of the word "or". Appellant was convicted of two charges of sexual abuse under *W.Va.Code* 61–8B–7(a)(1) [1984], which consists of subjecting "another person to sexual contact without their consent, and the lack of consent results from forcible compulsion." The fact that "sexual contact" may arise from contact with either the breasts, the anus or the sex organ does not mean that a defendant has committed three offenses if he happens to have touched all three. The definition of "sexual contact" in *W.Va.Code* 61–8B–1(6) [1986] gives the State three ways of proving first-degree sexual assault; it does not define three different offenses.

The legislative intent analysis, therefore, leads to the same conclusion as did the conduct analysis: Appellant in this case may properly be convicted of only one count of first-degree sexual abuse. Both prongs of the *Swafford* test being satisfied, I must conclude that the circuit court erred in convicting appellant on two counts of first-degree sexual abuse.

*Part III*

Repercussions of the Majority's Decision on Civil Rights

The majority, with its decision today, has joined in the national trend of arming prosecutors with tools that will obtain more convictions, but the increase in convictions will come with total disregard for whether the accused actually committed the crime. Although the "war on drugs" has become fashionable, the "war" has done little to stop drugs and the violence associated with them! Indeed, the main casualties of this "war" have been justice and civil liberties. In this Court, it seems to me that when a defendant is accused of the current crime of fashion (any crime with the word "sexual" in it), his constitutional rights cease to exist. This trend toward the erosion of civil rights has been set by the federal courts, but recently state supreme courts have been issuing decisions that are eroding basic constitutional protections as well. I hope today's decision is an aberration; however, I fear that the majority's opinion is indicative of a trend towards the erosion of civil liberties in West Virginia.

Some of these assaults on civil liberties have been well-documented. As part of the "war on drugs" Congress has armed federal prosecutors with the ability to confiscate any property that could be tangentially related to a drug crime, thus depriving property owners who may know nothing about the crime of their property without due process.[13] Similarly, despite the apparent

13. *See,* Steven Wisotsky, *A Society of Suspects: The War on Drugs and Civil Liberties,* Cato Institute Policy Analysis No. 180 (October 2, 1992); Terrance G. Reed, *American Forfeiture Law: Property Owners Meet the Prosecutor,* Cato Institute Policy Analysis No. 179 (September 29, 1992).

There are two types of forfeitures used by the federal government: criminal and civil. Criminal forfeitures occur only after a defendant is found guilty. The civil forfeitures, however, are used by the government to intimidate people and to deny them use of their property in violation of the *Constitution.* As E.E. Edwards III testified in front of the House Committee on Government Operations Legislation and National Security Subcommittee (September 30, 1992):

It is *civil forfeiture,* however, which concerns us the most due to the lack of constitutional safeguards and the unfair procedural advan-

tages afforded the government over ordinary citizens. Civil forfeitures are *in rem* proceedings. The government proceeds against property, and, by resort to a legal fiction, the property is held guilty and condemned. *Because the property itself is the defendant, the guilt or innocence of the property owner is irrelevant.* The "use" made of the property becomes the central issue. It is the legal fiction which allows many extremely harsh and unwarranted repercussions to flow from the use of civil forfeiture.

Moreover, the police are usually authorized to keep at least some of the profits realized in the seizure. This provides the police with incentives to seize everything they can, rather than resorting to seizures as a last resort. Moreover, the police do not even need probable cause to seize, although they must return the property if they later cannot show probable cause.

violation of the Sixth Amendment, the federal prosecutors have prevented accused people from hiring counsel by seizing all assets of an accused, including fees already paid to the accused's lawyer.[14] As John Henry Hingson III, president-elect of the National Association of Criminal Defense Lawyers, noted:

> The federal criminal defense bar had the wind knocked out of it when the United States Supreme Court declared that preconviction attorney fee forfeiture did not deny the federal rights to counsel and due process of law. States were quick to follow suit, enacting forfeiture legislation that mirrored the federal model. Prosecutors would have it much easier now, in both the state and federal courts. Depriving citizens accused of their chosen champions makes obtaining the one word verdict so much easier. Public defenders already toiling under backbreaking conditions will be awash in a sea of complicated criminal cases.

John Henry Hingson III, "Fee at Last! State Constitutions and Attorney Fee Forfeiture," *The Champion*, April 1993, 31.

Although seizures of assets and preventing the retention of counsel are the more obvious methods being used by prosecutors to raise their conviction rates without regard to the innocence of the accused, the more subtle methods are perhaps the most insidious. The most damaging of these subtle methods is the implementation of the federal sentencing guidelines, a process somewhat akin to what the majority has done today in the case before us.

Congress enacted the system that created the federal sentencing guidelines with an eye towards replacing the allegedly haphazard approach to sentencing in federal courts with a new system that "scientifically" assigned prison terms based on the charges and other conduct. The measure was enacted with strong bipartisan support

(Sen. Strom Thurmond and Sen. Edward M. Kennedy were co-sponsors). The goal was to make criminals who commit similar crimes serve similar sentences. However:

> The sentencing reforms of the last fifteen years have pointed in some useful directions, but in their current form they are bankrupt. These reforms have had consequences that few of their proponents anticipated. *Some things are worse than sentencing disparity, and we have found them.* [Emphasis added.]

Albert Alschuler, *The Failure of Sentencing Guidelines: A Plea for Less Aggregation*, 58 U.Chi.L.Rev. 901, 902 (1991). This result is just one more example of the natural law that you cannot bureaucratize excellence, you can only bureaucratize mediocrity. We have seen it in our public school system and in the way the Department of Motor Vehicles clerks provide service; now we have injected it into the federal courts.

Judge José A. Cabranes of the U.S. District Court of Connecticut[15] observed that despite the lofty goals set for the federal sentencing guidelines, the guidelines do not:

> even come close to achieving the asserted objectives of confining discretion and eliminating the bogeyman of disparity. Indeed, disparity is not only alive and well, it is now probably more common than before and certainly more hidden than before. **This is true in part because the Guidelines have *sub silentio* moved the locus of discretion from the judge to the prosecutor. It is largely the prosecutor, for example, who determines the quantity of drugs that will be charged or urged as the appropriate measure in calculating the Guidelines score; it is the prosecutor who will press or ignore the Probation Officer's calculation of the defendant's criminal**

---

14. *Caplin & Drysdale v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989).

15. Judge Cabranes was appointed by Chief Justice Rehnquist to represent the federal judiciary on the Federal Courts Study Committee (1988–

1990) to examine the problems with the Federal judiciary and to recommend changes. He has seen the problems with the guidelines at both an individual level as a trial judge, and at the system-wide level through his work on the study commission.

**history score; it is the prosecutor who will choose whether to stipulate facts dramatically increasing or decreasing the defendant's Guidelines range.** [Emphasis added.]

Cabranes, speech to University of Chicago Law School, 15 January 1992. Moreover, federal judges note that even the theoretically objective probation officers, who compile the "factual" reports upon which the judges are supposed to base their sentencing calculations, are, "after all, usually Pinocchios in the hands of Prosecutorial Gepettos." Jack Weinstein, *A Trial Judge's Second Impression of the Federal Sentencing Guidelines,* 66 Southern Cal. L.Rev. 357, 360 (1992).

Just as the federal sentencing guidelines were implemented with bi-partisan support, the call for elimination of the guidelines is now strident among people who actually must work under the system. Judge Richard Posner described the effects of the guidelines as "crazy" and "loony"; so much so that the use of the guidelines in the case that employed those words deprived the defendants of their equal protection rights. *United States v. Marshall,* 908 F.2d 1312, 1332 (7th Cir.1990) (Posner, J., dissenting), *aff'd sub nom. Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Judge Weinstein of the Eastern District of New York cites one of his colleagues as saying "[T]he Guidelines ... have made charlatans and dissemblers of us all. We spend our time plotting and scheming, bending and twisting, distorting and ignoring *the law* in an effort to achieve a just result. All under the banner of 'truth in sentencing'!" Weinstein, *supra,* at 365. Judge Weinstein goes on to note:

> [U]se of the guidelines does tend to deaden the sense that a judge must treat each defendant as a unique human being. The present system contributes to the bureaucratic mentality described by Hannah Arendt in her analysis of the "banality of evil." [Footnote omitted.] While it is not conceivable that federal judges will slide down the slippery slope to the utter inhumanity of their judicial counterparts in Nazi, fascist, and communist regimes,

it is quite possible that we judges will cease to aspire to the highest traditions of humanity and personal responsibility that ought to characterize our office. *Hysteria over crime has poisoned much of our society, including the justice system.* [Emphasis added.]

*Id.* at 366. Our own majority's hysteria over crimes with the word "sexual" in them have poisoned their view of the civil rights of accused persons in exactly the same way that the federal courts have been poisoned by drug prosecutions. They are setting a very bad precedent with their decision today.

Another horrible effect of the federal sentencing guidelines on the federal judicial system is the way in which non-charged conduct (or indeed conduct of which the defendant has been actually *acquitted* ) is still held against the defendant under the sentencing guidelines, thus *requiring* judges to sentence defendants for crimes of which they were either acquitted or never tried. As Judge Jon O. Newman of the Second Circuit stated in his 25 March 1993 dissent to the denial of *en banc* review of the decision in *United States v. Concepcion,* 983 F.2d 369, 395–396 (2d Cir. 1992) *reh'g denied sub nom. United States v. Frias* (Newman, J. dissenting):

> One of the bizarre aspects of the current Sentencing Guidelines regime is that a defendant can receive the same sentence whether he is convicted or acquitted. That phenomenon occurs when a defendant is charged with multiple counts. The pending case of Nelson Frias illustrates the problem.
>
> Frias was convicted of two counts of firearms violations and acquitted of a drug conspiracy violation. His applicable guideline range based solely on the convicted conduct would have been 12 to 18 months. His actual guideline range, based in part on the drug conspiracy *of which he was acquitted,* was 210 to 262 months. This is the same range that would have been applicable had he been convicted of the drug conspiracy. [Emphasis added.]

The net effect of the guidelines works to remove discretion from judges and to put it in the hands of prosecutors. This leads me to the inescapable conclusion that our federal judges have lost what José Cabranes might call their *cajones.*

Indeed, the commission that created the Guidelines expressed concern that one of the major drawbacks of the guidelines is the "potential to turn over to the prosecutor the power to determine the sentence by increasing or decreasing the number (or content) of the counts in an indictment." *Federal Sentencing Guideline Manual,* October 1987, Chapter 1, Part A, Policy Statement 4—The Guidelines Resolution of Major Issues. As Albert Alschuler describes it:

> [A] system of sentencing guidelines that on its face prescribes severe sentences but leaves plea bargaining unconstrained is a prosecutor's paradise. Sentencing guidelines masquerade as the sentencing commission's determination of appropriate penalties. In reality, the guidelines are bargaining weapons—armaments that enable prosecutors, not the sentencing commission, to determine sentences in most cases. In operation, the guidelines do not set sentences; they simply augment the power of prosecutors to do so.

Alschuler, *supra,* at 926. I believe that today's majority opinion, by condoning "over-charging" on the indictment side, has exactly the same effect in state court that some of the more obscene abuses of guideline sentencing have in federal court.

Today, prosecutors have more power and less judicial supervision than ever before. Today's prosecutors are like the sheriffs of the old wild west: they are the law. They participate in (and often lead) the investigations, they prepare the case, and now, increasingly, they set the sentences.[16] The main reason for the shift has been the creation of the "war" on crime and drugs. Our criminal justice system has shifted "from a due process-oriented criminal justice model to a model that has placed increasing emphasis on crime control and crime prevention." Bennett Gershman, *The New Prosecutors,* 53 U.Pitt.L.Rev. 393 (1992). Prosecutors have become the generals in the "war", armed with statutes like RICO, Drug Enterprise, Forfeiture, and the Sentencing Guidelines. Prosecutors have become crime fighters, not just advocates for the state. But because prosecutors are so closely tied to the detection and capture of the suspects, they cannot review the case objectively: In the prosecutor's view, there is no such thing as an innocent suspect or defendant.

As a result, today's prosecutors (especially federal prosecutors) do not act fairly towards defendants. In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the U.S. Supreme Court held that "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.... 'The United States wins its point whenever justice is done its citizens in the courts.'" However, today's Justice Department does not share that view: Today's goal is simply to maximize convictions.

This need to convict has driven prosecutors to rely on the plea bargain as a quick and easy way to maximize the number of convictions. A prosecutor can dispose of several plea bargains in an afternoon, but preparing for and holding a trial might take weeks or even months.[17] Even then,

---

**16.** "In 1989, 86% of all federal criminal cases were disposed of without a trial. *See U.S. Dep't of Justice, Sourcebook of Criminal Justice Statistics* 502 tbl. 5.25 (Kathleen Maguire & Timothy J. Flanagan, eds., 1990). The same phenomenon occurs in state cases: in 1988, 91% of all felony convictions in the 75 most populous counties in the United States were obtained through guilty pleas. *Id.* at 526 tbl. 5.51." Robert E. Scott and William J. Stuntz, *Plea Bargaining as Contract,* 101 Yale L.J. 1909, n. 1 (1992).

Although in most jurisdictions the sentence in a plea bargain is technically set by a judge, the prosecutor's deal is virtually always implemented. If that were not the case (that is, if prosecutors had no credibility), then defendants would not make deals with the prosecutors.

**17.** As Judge Frank Easterbrook of the Seventh Circuit describes the demands on the prosecutor:

after all that time and effort the prosecutor might not get the precious conviction: the jury might acquit! What's a prosecutor to do? [18]

The Justice Department, in its *Prosecutor's Handbook on Sentencing Guidelines* (1 November 1987), endorsed the position that federal prosecutors must take maximum advantage of the opportunities to use the guidelines to maximize convictions:

> The *Handbook* instructs federal prosecutors that it is 'imperative' for them to consult the Guidelines before choosing what offenses or counts to charge, particularly in multi-count cases, in order to obtain the 'best' (i.e., most substantial sentence) down the road.... [Especial-

> [Plea bargains] also benefit prosecutors and society at large. In purchasing procedural entitlements with lower sentences, prosecutors buy that most valuable commodity, *time*. With time they can prosecute more criminals. When eighty percent of defendants plead guilty, a given prosecutorial staff obtains five times the number of convictions it could achieve if all went to trial.

Frank Easterbrook, *Plea Bargaining as Compromise*, 101 Yale L.J. 1969, 1975 (1992). However, this is an optimistic view of what prosecutors do with their freed up time. Prof. Stephen J. Schulhofer provides a more realistic view:

> Both the chief prosecutor ... and her assistants have numerous incentives that diverge from the public's interest in optimal deterrence. The [prosecutor] is usually an elected official [in the state system] and whether elected or appointed, her goal is to enhance her reputation and political standing. An effective crime control strategy could contribute to that goal, but deterrence effects at the margin ... are likely to be imperceptible to the general public, especially over the short run. Several other factors (such as a high conviction rate, a good relationship with influential private attorneys, and an absence of high-profile trial losses) contribute more directly and more effectively to the [prosecutor's] political standing....
>
> Front-line prosecutors who actually negotiate plea agreements may or may not share the [chief prosecutor's] desire to enhance the office's political stature.... [T]he assistant's immediate goal is not necessarily to find the optimal strategy for controlling crime or even for reelecting his superior. Rather, his goal (in an economic model) is to maximize his own welfare, which is defined by some combination of career advancement, job satisfaction, and leisure. Pursuing and optimal crime control strategy may help advance the prosecutor's career, but other factors are likely to do so more effectively.

ly] problematic ... is the *Handbook's* express endorsement of sentence enhancement by 'splitting counts' between two indictments or between federal and state prosecutions. [Emphasis added.]

Stephen H. Glickman and Steven M. Salky, *Criminal Defense in the Era of Sentencing Guidelines*, 150 PLI/Crim 807 (1989) (PLI Order No. C4–4185). In the case before us the majority have basically enhanced bargaining power by "splitting counts."

The main way that federal prosecutors obtain the "best results" of maximum prosecutions is by encouraging defendants to

Stephen J. Schulhofer, *Plea Bargaining as Disaster*, 101 Yale L.J. 1979, 1987–1988 (1992). Note that precious little in the incentives for the prosecutor involve doing justice. That is the role for the judge, to ensure a just result.

**18.** Indeed, the jury may be the only remaining check on the prosecutor. As Professor Gershman points out, "[T]he heightened imbalance in the adversary system makes the prosecutor less accountable to his peers or to the courts than ever before. Sanctions for misconduct or overzealous advocacy are either nonexistent or not effective. It may be that the only effective check on prosecutorial power lies in the jury system. To be sure, only a fraction of cases go to trial, and most of those cases result in convictions. However, in those instances where juries have decisively rejected the prosecutor's case—particularly in several recent high-profile cases involving celebrities, public officials and major organized crime figures—constitute perhaps the most significant check on charging and adversarial abuse by the prosecutors." *Gershman, supra*, at 395, n. 14.

It is because the prosecutors have everything to lose and nothing to gain by going before a jury that they have incredible incentives to obtain a plea bargain, often at true bargain prices. However, an innocent defendant often will not (and should not have to) plead guilty to a crime that he did not commit. Yet an innocent defendant must often face the wrath of a politically motivated prosecutor and a significant potential extra punishment for making the prosecutor go to trial. Although it is true that the innocent defendant may be acquitted, it is also true that the prosecutors and police pull out all stops (including lying under oath) to get convictions. Obviously there must be some reasonable discount for pleading guilty, but a penalty of 300 to 1,000 percent sentence enhancement for *not* pleading guilty strains due process notions to the breaking point.

plead guilty regardless of whether the defendants are guilty. Indeed:

> [T]he Guidelines may actually penalize the unsuccessful presentation of a defense at trial. Guideline § 3C1.1 provides for a two-level sentence increase if the defendant's [*sic*] 'attempts to impede or obstruct the administration of justice during the ... prosecution of the instant offense.' On its face this may look relatively innocuous, but the official commentary says the sentence enhancement applies if, for instance, the defendant testifies untruthfully at trial. [Footnote omitted.] If courts routinely apply § 3C1.1 in sentencing defendants who testify to their innocence at trial—and perhaps also to defendants who present any unsuccessful defense on the merits—it will be a significant disincentive to going to trial. To make the point another way, there is potentially a four-level sentencing difference between presenting a vigorous but unsuccessful defense at trial and pleading guilty with an appropriate acceptance of personal responsibility.

Glickman, and Salky, *supra* (WL *4).

The Guidelines have given federal prosecutors the ability to create extremely high potential sentences in order to coerce defendants into pleading guilty instead of going to trial. The majority's decision in the case before us gives West Virginia prosecutors a similar power. When it comes to a sexual abuse case, the majority has given the prosecutor *carte blanche* to charge as many counts of that abuse as he would like. An innocent defendant facing a potential of consecutive sentences adding up to 50 or 60 years will feel strong pressure to plead guilty to a lesser charge and be sentenced to one to five years with probation. Moreover, if the prosecutor offers the same deal to the actual criminal in exchange for his testimony against an innocent alleged defendant, the true criminal would jump at the chance, while the innocent co-defendant would now face prosecution and a potential 60 year sentence instead of serving probation simply *because he is innocent* and demands to go to trial.

The majority should recall the recent case of Glenn Dale Woodall, and the way that the police and prosecutors manufactured the case against him, to realize that prosecutors do not behave as if they are seeking justice, but try to maximize convictions. *See State v. Woodall*, 182 W.Va. 15, 385 S.E.2d 253 (1989) (Neely, J., affirming in part, reversing in part the initial conviction due to errors at trial. Subsequent DNA evidence revealed that the prosecution and police manufactured a large part of their case against Mr. Woodall, and the State settled Mr. Woodall's lawsuit for wrongful imprisonment for $1 million). Moreover, the Woodall case stands out not because it is rare, but because the prosecutor and the police got caught manufacturing a case against an innocent defendant.

Often we see a situation where the prosecutor offers a group of suspects a deal: Turn in the others, and you'll receive a light sentence. So who accepts the deal? The truly guilty accept the deal, knowing it's the best they can do. However, the innocent in the group will not plead, because they did not commit a crime. At that point, the prosecutor turns full bore against the innocent defendants; then the combination of the other testimony and the prosecutor's quest for conviction are often difficult to overcome. The prosecutor does not need any more leverage to coerce innocents to plead guilty; however, the majority's opinion today gives the prosecutor the ability to bring a *virtually unlimited number* of counts against a defendant without violating the Double Jeopardy clause.

It is true that in this case the circuit court had the good judgment to sentence appellant to concurrent sentences. Although no significant injury befell appellant *ex post*, that does not cure the problem caused by the violation of appellant's double jeopardy rights. There is no way *ex ante* that appellant could have known that the circuit court would sentence him that way. If, before the trial, he was presented with a plea offer by the prosecution, the prosecutor surely would have impressed the defendant with the potential for consecutive sentences if he *did not* plead guilty.

With today's opinion, the majority is falling into the same trap that the federal sentencing guidelines have created for the federal judiciary: increased charging discretion for the prosecutor *necessarily* leads to decreased justice being provided by the courts.

Finally, I would add one last observation: Specialization in the law has now relegated criminal law to the ministrations of a small group of lawyers at the top of the profession, and to an incalculably larger group of lawyers at the bottom. There is little in between. Because criminal law involves almost exclusively the processing of impecunious members of the underclass, insufficient money is at stake in any criminal case to attract prominent, well-connected lawyers. Although a few white collar criminals and a few drug dealers have enough money to hire good lawyers, almost all criminal defendants are represented by overworked, underpaid public defenders or court-appointed lawyers. Sometimes public defenders are young, ambitious, intelligent, idealistic advocates; most of the time, however, public defenders are simply hacks. Court-appointed lawyers are often good, but lawyers who find that they can make vastly more money in civil practice seek to avoid court appointments. In West Virginia, not only does court-appointed criminal work pay badly, with adequate funds never being appropriated by the legislature, court-appointed criminal work often does not pay at all. Thus, the legislature, the bar, and now the courts are coming to treat the whole field of criminal law as just another part of the waste management industry.

The staffs of prosecuting attorneys are largely composed of bureaucratized government lawyers whose interest in being on the cutting edge of the law is vanishingly small. Assistant prosecutors, in general, are folks who have accepted the regular hours and fair job security of the government coffee suck in lieu of more arduous, stress-laden and challenging work. On the federal side, with the advent of secure, reasonably well paid, lifetime jobs as civil service prosecutors (unlike yesteryear when the U.S. Attorney's office was a training ground for great lawyers), professional federal prosecutors now have little sense of common humanity and see defense counsel not as adversaries but as personal enemies.

Although, perhaps, this description is a bit of a caricature, like all caricatures, it is but an exaggeration of the God-given truth. Unlike the days of my youth when most high quality lawyers at least from time to time found themselves in criminal court, today the lawyers with political connections, high-powered intellectual equipment, and good supporting staffs have no knowledge of nor interest in anything that has to do with criminal justice. Furthermore, this tendency to have criminal law practiced by an extraordinarily narrow group of specialists is even more pronounced in the federal courts where, as I indicated earlier, arduous efforts have been made by lifetime, civil service prosecutors to keep high quality, expensive lawyers who might beat them out of the system. Part of our problem, then, is that the great majority of lawyers in this country—particularly those working in the enormous corporate and defense firms—have absolutely no idea what a joke custom crafted, individualized justice has become in the federal court system and what a joke custom crafted, individualized justice is in danger of becoming in the state court systems.

It is time, then, for us to take a stand on this frontal assault on our civil liberties; it is time for the courts to reassert their proper role in the administration of justice. I regret that the majority, in its yielding to hysteria over a crime that has the word "sexual" attached to it, has failed to see the consequences of it's ruling today.