# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-0633** (Jefferson County 17-F-154)

**Devin Michael Collins,**
**Defendant Below, Petitioner**

**FILED**

**September 4, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Devin Michael Collins, by counsel B. Craig Manford, appeals the Circuit Court of Jefferson County's July 18, 2019, sentencing order following his convictions for two counts of attempted murder, one count of burglary, sixteen counts of wanton endangerment involving a firearm, one count of use of a firearm during the commission of a felony, and one count of felony destruction of property. Respondent State of West Virginia, by counsel Holly M. Flanigan, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner and Kassidy Thorn ("Ms. Thorn") began a romantic relationship in approximately June of 2014 and dated for about two years, breaking up in June of 2016. A few months later, during the early morning hours of November 8, 2016, petitioner drove to the general vicinity of the home where Ms. Thorn was staying, which was owned by Ms. Thorn's aunt, Cindy Fincham. Other members of Ms. Thorn's family were also staying in the home, including Ms. Thorn's mother, Carolyn Partridge; her brother, William Partridge; and her sister, Kaitlin Thorn. Petitioner parked his vehicle in a church parking lot located approximately one-half mile from the home, and walked to the home with a loaded semi-automatic AR-15,[1] brass knuckles, a fixed blade hunting knife, and bags containing numerous loaded magazines, over two hundred rounds of

---

[1] Petitioner purchased the AR-15 approximately one week prior to November 8, 2016.

1

ammunition, and a loaded sawed-off shotgun.[2] Upon reaching the home, petitioner left some ammunition and the sawed-off shotgun in the surrounding tree line and proceeded to the home with his AR-15 and ammunition.

Petitioner approached the back of the home and unloaded five shots into the back glass door, which allowed him to gain entry into the home. Kaitlin Thorn was sleeping on a couch near the back door, and she described shots whizzing by her. Petitioner's actions activated the security alarm in the home, and many of those actions were caught on security cameras placed throughout the home.[3] Petitioner walked through the home and saw Ms. Thorn, her mother, and her aunt at the top of a flight of stairs. Petitioner hurried up the stairs, reloading the magazine of his AR-15 along the way.

Ms. Thorn, Ms. Partridge, and Ms. Fincham shut themselves in a bedroom.[4] Ms. Fincham hid behind a television stand, and Ms. Thorn and Ms. Partridge went into the bedroom closet to retrieve an old, inoperative rifle and a functioning rifle. Petitioner began shooting into the bedroom door. The bullets reached the closet in which Ms. Thorn and Ms. Partridge were hiding, so they exited with the guns they had stored in the closet. Petitioner gained entry into the bedroom, grabbed Ms. Thorn, threw her to the floor, and got on top of her. Ms. Thorn landed on top of the antique rifle she had taken from the closet. Ms. Partridge hit petitioner, which caused him to shift his focus to her and release Ms. Thorn.

After petitioner stood up, he began trying to wrest Ms. Partridge's rifle away from her. Ms. Thorn, who now had access to the antique rifle, struck petitioner's gun with the antique rifle, causing petitioner's gun to fall to the ground and both guns to break. Petitioner continued trying to pry Ms. Partridge's rifle from her grip. Ms. Thorn pushed petitioner, which caused him to release Ms. Partridge's rifle. Ms. Thorn then took the rifle from Ms. Partridge and led petitioner out of the home.

Meanwhile, one of the other occupants of the home called the police and reported a burglary in progress. Deputy C.D. Hess, of the Jefferson County Sheriff's Office, was one of the officers who responded to the call. When Deputy Hess arrived at the victims' home, he approached another officer who was placing petitioner in handcuffs. Deputy Hess led petitioner to his cruiser, and petitioner reportedly remarked, "I have nothing to hide, everything I did I'm guilty of." The deputy informed petitioner that he needed to secure the scene first and did not yet want to question him. Petitioner replied, "I broke in and shot up the house. There is no one else. I'm guilty of everything." After Deputy Hess secured the scene, he transported petitioner to the Jefferson County Sheriff's Office for processing.

---

[2] Petitioner made the modification to the shotgun approximately two days prior to November 8, 2016.

[3] The victims installed security cameras throughout their home shortly after petitioner and Ms. Thorn broke up because Mr. Partridge overheard petitioner recount to petitioner's uncle that petitioner's AR-15 did not have a large enough magazine capacity. Per Mr. Partridge, this comment "raise[d] a red flag" for the family.

[4] The actions that took place in the bedroom were not recorded by the security cameras.

Petitioner gave a statement to Deputy Hess in which he acknowledged having wanted to kill Ms. Partridge and Ms. Fincham for several months, blaming the two for their role in petitioner's and Ms. Thorn's breakup, but he denied wanting to kill Ms. Thorn. Instead, petitioner claimed to have only wanted to tell her things he had not been able to tell her since their breakup. Petitioner also stated that, as soon as he exited his car that night, he knew he could not kill anyone and abandoned the idea of killing Ms. Partridge and Ms. Fincham.

On January 18, 2017, the Jefferson County Grand Jury returned a sixteen-count indictment charging petitioner with various crimes related to his actions on November 8, 2016. This indictment was superseded on September 21, 2017, by a twenty-four-count indictment charging petitioner with the attempted first-degree murder of Ms. Fincham, the attempted first-degree murder of Ms. Thorn, the attempted first-degree murder of Ms. Partridge, kidnapping Ms. Thorn, burglary, seventeen counts of wanton endangerment involving a firearm, use of a firearm during the commission of a felony offense, and destruction of property.

Petitioner's trial began on February 25, 2019.[5] Ms. Thorn testified that she was awakened by three loud bangs at approximately 1:00 a.m. on November 8, 2016. Ms. Thorn and her mother exited their respective bedrooms and started toward the first floor of their home to turn off their security system and to determine what was going on. As they reached the stairs, they saw petitioner at the bottom. Ms. Thorn testified that petitioner saw them and pointed his AR-15 at them. Ms. Thorn further testified that, after she and Ms. Partridge ran into the bedroom closet, they "felt bullets coming through—stuff was getting shot up so we left the closet."

Ms. Thorn was asked whether petitioner fired his gun at them once he was inside the bedroom. Ms. Thorn said, "That is what I saw," and that petitioner pointed the gun at her and fired it. Ms. Thorn acknowledged that she did not provide this information to Deputy Hess when he took her statement, explaining that she gave her statement "within moments of that happening and I had no time to actually think." Ms. Thorn was also asked, "Okay. Is it possible that you were just so damned scared—excuse me, ladies and gentlemen—that you thought something happened when it really didn't?" Ms. Thorn affirmed that "[i]t's possible," and she agreed she could be "confusing the shots that were coming through the door with him taking an actual intentional shot at [her]."

During Ms. Partridge's testimony, she testified that petitioner pointed his gun at her after she exited the closet. Ms. Partridge also stated that petitioner came toward her with his gun, but then abruptly grabbed Ms. Thorn. Ms. Partridge was asked whether she saw petitioner try to shoot Ms. Thorn. Ms. Partridge stated, "I don't think—he wasn't really aiming at anything." When informed that Ms. Thorn had testified that petitioner tried to shoot her, Ms. Partridge replied that petitioner "was trying to kill everyone in the house." When pressed on whether she saw petitioner try to shoot Ms. Thorn, Ms. Partridge stated that she "saw him shooting inside the room where he saw three people," and she testified that petitioner "came in the room shooting."

---

[5] Numerous witnesses testified. We recount only that testimony relevant to petitioner's claims.

3

Ms. Fincham testified that she has a physical disability that prevented her from assisting Ms. Thorn and Ms. Partridge, but that she observed the events that took place in the bedroom. Ms. Fincham testified that petitioner fired his gun upon entering the bedroom, but when asked whether petitioner shot at her, she responded, "Well, I was hidden so I don't think he saw me, but—"

Before the second day of testimony started, the court discussed with the parties the proper scope of Deputy Hess's testimony as it related to the statement petitioner provided immediately following the attack. Petitioner argued that, should the State inquire into the inculpatory statements he made, he should also be permitted to inquire into the exculpatory statements he made. The court found that if additional context is needed in fairness to the party against whom the statement is used, then petitioner "would have the right to cross examine the detective on the issue of, as he said, did he later clarify?" The court believed it "would be committing a pretty significant error if [it] did not allow that."

As a result of this ruling, Deputy Hess testified to petitioner's statements that he had thought about killing Ms. Partridge and Ms. Fincham for several months, but the officer also stated that petitioner said he had changed his mind about killing them as soon as he stepped outside of his car in the church parking lot on the night of the attack.

At the conclusion of trial, the jury found petitioner guilty of the attempted first-degree murder of Ms. Fincham, the attempted first-degree murder of Ms. Partridge, burglary, sixteen counts of wanton endangerment involving a firearm, use of a firearm during the commission of a felony, and destruction of property. Petitioner was acquitted of the attempted first-degree murder and attempted kidnapping of Ms. Thorn.[6]

Petitioner moved for a new trial or, alternatively, a judgment of acquittal.[7] Petitioner argued that the circuit court should have granted his motion for a directed verdict as to the attempted murder counts because he took no overt act toward completion of that crime. Petitioner argued that, with respect to the shots fired in the bedroom, all were into the door of the bedroom, as reflected by the damage to the door, number of casings found, and number of bullets remaining in petitioner's gun. Petitioner argued that this evidence conclusively showed that no shots were fired inside the bedroom. Petitioner also argued that he only committed two "acts" of wanton endangerment, rather than sixteen separate acts. Further, petitioner claimed that the court erred in not dismissing the use of a firearm in the commission of a felony charge and in permitting the State to elicit testimony from Deputy Hess regarding petitioner's statement without admitting the entire statement.

The parties appeared for sentencing on May 31, 2019. Before sentencing petitioner, the court denied petitioner's motion for a new trial or, alternatively, for judgment of acquittal. The

---

[6] Before the jury began its deliberations, the State elected to proceed on attempted kidnapping, a lesser-included offense of the charged count of kidnapping. The State also dismissed one count of wanton endangerment.

[7] During trial, petitioner also moved for judgment of acquittal following the State's case-in-chief and at the close of evidence. The circuit court denied these motions.

4

court proceeded to sentence petitioner to not less than three nor more than fifteen years in prison for each of petitioner's two attempted murder convictions, which were further ordered to run concurrently with one another but consecutively to the other sentences. Petitioner was sentenced to not less than one nor more than fifteen years for his burglary conviction, which was ordered to run consecutively to every other sentence. For six wanton endangerment involving a firearm convictions, which were related to petitioner's actions of entering the home and placing Kaitlin Thorn in danger, the court sentenced petitioner to determinate five-year terms, which were ordered to run concurrently with one another but consecutively to every other sentence. The court sentenced petitioner to a determinate term of five years of incarceration for three additional wanton endangerment with a firearm convictions to account for the different victims in the bedroom, which were each ordered to run consecutively to the other sentences. For the remaining seven wanton endangerment involving a firearm convictions, the court sentenced petitioner to determinate five year terms of incarceration, which were ordered to run concurrently with one another and the other sentences. Petitioner was sentenced to ten years for the use of a firearm during the commission of a felony conviction, which was to be served consecutively to the other sentences. Finally, the court sentenced petitioner to one year in jail for his felony destruction of property conviction, which was to run consecutively to the other sentences. The court entered its sentencing order on June 13, 2019, and an amended sentencing order on July 18, 2019. Petitioner now appeals.

On appeal, petitioner raises three assignments of error. First, petitioner argues that the circuit court erred in failing to grant his motions for judgment of acquittal on the attempted murder and wanton endangerment counts that were made following the State's case-in-chief and at the close of the evidence. Alternatively, petitioner argues that the jury's verdict on these counts was contrary to the evidence presented. With respect to the attempted murder convictions, petitioner argues that there was no evidence adduced of an overt act, that the evidence showed mere preparation, and that the evidence showed that he abandoned any intent to kill upon parking his car at the church parking lot. Petitioner also highlights that, as conclusively demonstrated at trial, he fired no shots in the bedroom. Although the circuit court concluded that the jury's verdict was supported by the fact that petitioner fired eleven shots into the bedroom door, petitioner argues that this conclusion is flawed because the jury acquitted petitioner of the attempted murder of Ms. Thorn under the same set of facts and circumstances. Petitioner maintains that without evidence of shots fired at the victims, there was no evidence that petitioner took an overt act toward murdering his victims.

Concerning his wanton endangerment convictions, petitioner argues that the evidence showed that his "sole intent" in firing his gun sixteen times was to gain entry into the home and then into the bedroom. Petitioner argues that, at most, there were three separate acts: one act in shooting through the back glass door to gain entry into the residence; a second act in shooting the bedroom door four times; and, when the four shots failed to open the door, a third act involving seven more shots into the bedroom door. Petitioner states that, under these circumstances, no rational jury could have concluded beyond a reasonable doubt that he committed sixteen separate acts of wanton endangerment with a firearm.[8]

---

[8] Petitioner also claims that the circuit court "could have easily corrected the multiplicitous effect of the jury's mistaken verdict by grouping the wanton endangerment convictions into three separate groups for sentencing," and that the failure to do so constituted an abuse of discretion.

5

We review de novo a trial court's disposition of a motion for judgment of acquittal. *State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996). Accordingly, "this Court, like the trial court, must scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." *Id.* We have also repeatedly acknowledged the heavy burden taken on by a criminal defendant in challenging the sufficiency of the evidence to support a conviction:

> The defendant fails if the evidence presented, taken in the light most agreeable to the prosecution, is adequate to permit a rational jury to find the essential elements of the offense of conviction beyond a reasonable doubt. Phrased another way, as long as the aggregate evidence justifies a judgment of conviction, other hypotheses more congenial to a finding of innocence need not be ruled out. We reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 303, 470 S.E.2d at 622. "[A]ll the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict." *Id.* at 304, 470 S.E.2d at 623.

To "constitute the crime of attempt, two requirements must be met: (1) a specific intent to commit the underlying substantive crime; and (2) an overt act toward the commission of that crime, which falls short of completing the underlying crime." Syl. Pt. 2, in part, *State v. Starkey*, 161 W. Va. 517, 244 S.E.2d 219 (1978), *overruled on other grounds by State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). And, in syllabus point 2 of *State v. Burd*, 187 W. Va. 415, 419 S.E.2d 676 (1991), we set forth the specific requirements for attempted murder: "Where formation of criminal intent is accompanied by preparation to commit the crime of murder and a direct overt and substantial act toward its perpetration, it constitutes the offense of attempted murder."

Concerning intent, petitioner acknowledges that he told Deputy Hess that he had intended to murder Ms. Partridge and Ms. Fincham. Although he claims that, as he also told Deputy Hess, he abandoned this intent upon parking his car at the church, he nevertheless proceeded to walk the approximate half-mile distance to the victims' home with two guns, over two hundred rounds of ammunition, a knife, and brass knuckles in tow. The jury clearly attached no credibility to petitioner's statement that he abandoned his previously formed intent. Then, after burglarizing the home, petitioner caught view of the two women he acknowledged wanting to kill, followed them to the bedroom, and proceeded to carry out the overt act of unloading eleven rounds into the bedroom door behind which they were located. Indeed, it cannot be said here that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *LaRock*, 196 W. Va. at 303, 470 S.E.2d at 622. Finally, there is no evidence that petitioner made any

---

Petitioner provides no law or analysis to support this assertion; accordingly, we decline to address it. *See State v. Sites*, 241 W. Va. 430, 442, 825 S.E.2d 758, 770 (2019) (declining to address arguments "that lack citation of authority [or] fail to structure an argument applying applicable law" because those arguments are not compliant with this Court's rules).

statements to police concerning his intention to kill Ms. Thorn; therefore, the jury's verdict on the attempted murder count involving Ms. Thorn is not incompatible with its verdict on the two counts related to Ms. Partridge and Ms. Fincham.

Regarding petitioner's challenge to his wanton endangerment involving a firearm convictions, West Virginia Code § 61-7-12 provides, in part, that "[a]ny person who wantonly performs any act with a firearm which creates a substantial risk of death or serious bodily injury to another shall be guilty of a felony." The evidence adduced at trial clearly supported sixteen separate convictions for wanton endangerment involving a firearm where petitioner fired his gun into the home sixteen separate times, each individual shot creating "a substantial risk of death or serious bodily injury." *Id.* Petitioner cites no law to support his claim that the shots should be aggregated into, at most, three convictions. In fact, in addressing a claim that multiple counts of wanton endangerment violated double jeopardy principles, we rejected such an argument in *State v. Evans*, No. 11-0170, 2011 WL 8199954 (W. Va. Sept. 13, 2011)(memorandum decision), stating that "[t]he plain language of West Virginia Code § 61-7-12 makes it clear that each shot fired constitutes a separate violation because each individual gunshot 'creates a substantial risk of death or serious bodily injury to another.'" *Id.* at *2.

In petitioner's second assignment of error, petitioner argues that the court should have dismissed the use of a firearm in the commission of a felony charge as violative of double jeopardy principles. In support, petitioner states that "[i]t would appear that the legislative intent behind" the wanton endangerment involving a firearm and the use of a firearm in the commission of a felony statutes "are the same thus resulting, in this case, as multiple punishments for the same act."

We review de novo double jeopardy claims. Syl. Pt. 1, *State v. Sears*, 196 W. Va. 71, 468 S.E.2d 324 (1996). "The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense." Syl. Pt. 1, *Conner v. Griffith*, 160 W. Va. 680, 238 S.E.2d 529 (1977). But, with respect to this third prohibition—the prohibition against multiple punishments for the same offense—"the Legislature may intentionally prescribe multiple punishments for the same conduct," *Sears*, 196 W. Va. at 78, 468 S.E.2d at 331; thus, "[a] claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment." Syl. Pt. 3, *State v. Rummer*, 189 W. Va. 369, 432 S.E.2d 39 (1993) (citation omitted). As we explained in *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992), the test articulated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932), was used "as a rule of statutory construction to determine whether separate sentences were authorized." *Gill*, 187 W. Va. at 142, 416 S.E.2d at 259.[9] Therefore, the *Blockburger* test, as a rule of statutory construction, does not control "where there is a clear indication of contrary legislative intent." *Id.* at 138, 416 S.E.2d at 255, syl. pt. 5, in part.

---

[9] Under this test, "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *State v. Gill*, 187 W. Va. at 142, 416 S.E.2d at 259 (citation omitted).

Here, in enacting the use or presentation of a firearm during the commission of a felony statute, the Legislature explicitly provided that that statute would operate "[*a*]*s a separate and distinct offense, and in addition to any and all other offenses provided for in this code.*" W. Va. Code § 61-7-15a (emphasis added). Accordingly, the Legislature made clear its intent that the use or presentation of a firearm during the commission of a felony is a felony separate and distinct from, and in addition to, the felony offense of wanton endangerment involving a firearm, and, therefore, there is no merit to this assignment of error.

Lastly, in petitioner's third assignment of error, he claims that the court erred in allowing Deputy Hess to testify about portions of petitioner's statement without allowing admission of the entire statement. Petitioner asserts that, had his entire statement been introduced, the jury "would have been able to view the [p]etitioner not as the monster portrayed in the [security] videos they watched, and "[t]hey would have garnered insight to his true intent and his inability to even attempt the crime of murder."

"A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998). Petitioner relies on Rule 106 of the West Virginia Rules of Evidence in support of his argument, which provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may request the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." While, facially, Rule 106 applies where a party introduces a writing or recorded statement into evidence, we have also determined that it is "applicable where the party's utilization of the writing or recorded statement is 'tantamount to the introduction of the [document] into evidence.'" *State v. Gray*, 204 W. Va. 248, 251, 511 S.E.2d 873, 876 (1998) (citation omitted).

Before Deputy Hess testified, the parties presented argument concerning the permissible scope of the officer's testimony related to petitioner's statement:

> [The State]: We don't plan on introducing [petitioner's statement]. We plan on questioning the off—well, [co-counsel] is going to question the officer about the answers that were given to him by the [petitioner]. We, you know, obviously intend to introduce the testimony that he made inculpatory statements, the [petitioner] made inculpatory statements to the officer that were adverse to his position."
>
> . . . .
>
> [Petitioner]: Well, I think you read the transcript. There's give and take at that point in time, so if my client makes something that's adverse against—makes a statement adverse against his interest such as, "Hey, 'til I got there, I thought maybe I killed somebody but when I got there, I changed my mind in my car." So, I think under the rule I cited . . . I think that opens the door a little bit in me saying, well, did you sleep in there, did the person—the officer clearly inquired further. "Well, when did your intent stop?" Okay. And I mean he was such a—he's a good guy,

8

but I think I would be allowed—if they do that, I'd be allowed to open the door just to that limited scope as it relates to the answer that he gives to the State in fairness.

The court agreed with petitioner, reasoning that,

> I think I'll cite not only Rule 106 but State [v.] Gray, 204 W. Va. 248 for the proposition that if additional context is needed in fairness to the party against who the statement is made that additional context made through other comments made during the course of the interview. And I would think that [petitioner] would have the right to cross examine the detective on the issue of, as he said, did he later clarify? Did this intent to hurt anybody stop at the point that he got out of his car? And I think I would be committing a pretty significant error if I did not allow that.

The court proceeded to limit petitioner to using statements that were "in the context of whatever testimony is elicited on direct," and it directed the parties to "just make an objection, we'll have a sidebar . . . [i]f we get into an area where either side is uncomfortable."

We find no abuse of the circuit court's discretion in its ruling on petitioner's statement. Petitioner's request was of "limited scope" in that he sought to be able to elicit testimony from Deputy Hess concerning petitioner's statements that "relate[] to the answer that he gives to the State in fairness." The court permitted petitioner to do just that, and the court's ruling is in accord with Rule 106's purpose of "reduc[ing] the risk that a writing or recording will be taken out of context or that an initial misleading impression will influence the minds of the jurors." *Id.* at 250-51, 511 S.E.2d at 875-76. The Rule does not, however, require introduction of petitioner's entire statement, "but rather only that portion of the remainder of the document which explains or clarifies the previously admitted portion." *Id.* at 254 n.8, 511 S.E.2d at 879 n.8. Accordingly, petitioner has demonstrated no error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** September 4, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

9